Sherman L.G. NOBLE,
Plaintiff–Appellee,

v.

Janice SCHMITT and Connie Stevens,
Defendants–Appellants.

No. 94–5697.

United States Court of Appeals,
Sixth Circuit.

Argued July 31, 1995.

Decided June 14, 1996.

Ronald E. Marstin (argued and briefed), Legal Aid Society, Louisville, KY, for plaintiff-appellee.

W. David Shearer, Jr. (argued and briefed), Taustine, Post, Stosky, Berman, Fineman & Kohn, Louisville, KY, for defendants-appellants.

Before: JONES and BOGGS, Circuit Judges, and CHURCHILL, District Judge.[*]

NATHANIEL R. JONES, Circuit Judge.

Plaintiff Sherman L.G. Noble, an involuntarily committed mental patient at Central State Hospital ("CSH") in Louisville, Kentucky, brought suit against Defendants Janice Schmitt and Connie Stevens, CSH personnel, pursuant to 42 U.S.C. § 1983. Noble charged Schmitt and Stevens with violations of his free speech and due process rights under the First and Fourteenth Amendments. Defendants moved for summary judgment on grounds of qualified immunity, and the district court denied their Motion. We affirm the district court's decision.

## I.

On March 7, 1989, Noble was committed to CSH after being diagnosed as a paranoid schizophrenic. He was then placed in the Grauman Building ("Grauman"), which houses CSH's violent male patients. CSH staffs Grauman with a Treatment Team to care for those patients. The Grauman Treatment Team implemented various administrative policies and procedures for dealing with its patients. The Team was responsible for creating a treatment plan and a behavioral plan for each Grauman patient to regulate patient behavior. The treatment plan analyzed the patient's psychological and physical ailments and prescribed treatment in accordance with the patient's needs. The behavioral plan, on the other hand, outlined strategies for intervention in the event that the patient grew violent. The Team met twice a week to discuss the plans for each patient, and conducted a briefing each morning to "run the list" of patients. In addition to its individualized plans, the Team also established a general regulation scheme for the Grauman patients, outfitting the patients with color-coded wristbands. The wristbands came in four colors that conferred different levels of freedom and privileges. Patients who exhibited good behavior earned higher-ranked wristbands.

Furthermore, the Team instituted a "generic intervention" strategy for those patients who "acted out." The Team applied the generic intervention strategy incrementally. When a patient threatened to act out, the nurse on duty would ask the patient to lower his voice. If the patient refused, the nurse would suggest that the patient take a "time out" in his room. If the patient's unruliness continued, then the nurse would offer him medication or take him to "open

[*] The Honorable James P. Churchill, United States District Judge for the Eastern District of Michigan, sitting by designation.

seclusion" in an unlocked room. When the patient left open seclusion, or caused a disturbance so as to endanger himself or other patients, the Team would restrain the patient and administer medication to calm him down. Although Team members could only administer restraints with the approval of a physician, they enjoyed general authority to forcibly inject a patient with medication when necessary. Generic interventions were often incorporated into treatment and behavioral plans.

Grauman patients possessed significant rights regarding their medical care. Pursuant to state law, CSH allowed patients to reject parts of their treatment plans;[1] however, they could not refuse generic interventions. Under CSH rules, a patient may file a written grievance with the Team to protest a form of treatment or intervention. The Team or its representative then issues a response, and if the patient disagrees with the response, then he can appeal to the CSH "human rights" committee. If the patient contests the committee's findings, then he can seek ultimate review from the CSH director.

Immediately after his transfer to Grauman, relations between Noble and Team members were strained. He routinely rejected treatment. He also filed three to four grievances a day. According to Grauman nurse Dorothy Perkins, at least seventy-five percent of Noble's complaints involved the Defendants. Noble further assisted other Grauman patients in filing grievances, many of which resembled his own. *See* J.A. at 308 (Urton Dep.). James Brown, a Grauman security officer, testified that the patients solicited Noble for assistance. J.A. at 275 (Brown Dep.). For the Team, however, Noble "was like a thorn in everybody's side." *Id.* at 139 (Perkins Dep.). Dr. John Urton, the Team's psychiatrist, deemed Noble's conduct "disruptive" because he had fostered resentment of the Team among the patients. *Id.* at 308.

Noble alleges that Stevens and Schmitt took reprisals against him for his iconoclastic behavior. Perkins testified that the Defendants denied Noble access to recreational areas even though he was issued a blue wristband which entitled him to use of such areas. *Id.* at 151. Perkins claimed that they employed this tactic in order to restrict his access to other Grauman patients. *Id.* at 153. Noble responded angrily, and he alleges that Stevens and Schmitt attempted to provoke him so that he would act out. Noble states that he never acted out in response to this provocation and instead chose to draft angry grievances. Subsequently, on October 24, 1990, the Team amended Noble's behavioral plan to state that if he helped Grauman patients draft any grievances, he would be demoted for seven days to a green wristband, which conferred minimum privileges. *Id.* at 419. He was confined "to the unit" for two weeks in November 1990. Noble's Br. at 25. In response to these measures, Noble filed angry grievances on November 11, 1990, December 4, 1990, December 5, 1990, and December 6, 1990. *Id.*

Noble alleges two specific incidents of improper conduct by the Defendants. The first incident occurred on December 16, 1990. At about 1:00 p.m., Schmitt announced that the recreation room would not be available to patients due to a staff shortage. Noble, who apparently wanted to watch a ballgame on television, angrily protested and vowed to file a grievance. He cursed at Schmitt, and Schmitt asked him to lower his voice. Noble refused and, according to the Defendants, threatened Schmitt. Schmitt demoted Noble to a green wristband and summoned a security officer, Andre Fant, to escort him to open seclusion. After arriving in open seclusion, Noble quietly occupied his time until Schmitt arrived on the scene. They argued, and the argument escalated to the point where Noble threw his shoes in Schmitt's direction and banged his fist on the door. Shortly thereafter, another nurse, Shelby Dreher, gave Noble a choice between injected medication or oral medication. Noble opted to take orally eight milligrams of Trilafon, an antipsychotic drug. He was then re-

---

1. Ky.Rev.Stat.Ann. § 202A.191(1)(g) grants hospitalized patients the right to refuse intrusive treatment.

strained by four-point restraints, and remained in open seclusion until 5:12 p.m. Noble contends that he was forcibly medicated and improperly restrained. Defendants, on the other hand, maintain that Noble voluntarily took the medication, and alternatively, that Schmitt was justified in forcibly medicating Noble because he posed a threat to himself and other patients.

The second incident occurred on February 7, 1991, when Stevens allegedly instructed Perkins—who at the time was a new member of the Team—to incite Noble to act out. This would allow the Team to forcibly intervene. Rick Cain, a patient advocate with the Kentucky Department for Protection and Advocacy, received word of the incident and interviewed Perkins a week later. According to Perkins' notes, CSH Director George Nichols was present at the meeting. Cain asked Perkins about the incident, and reported his findings to the Division of Licensing and Regulation for the Kentucky Cabinet of Human Resources. Nichols recommended an investigation. In a letter to Nichols dated February 19, 1991, Cain concluded that Stevens' conduct constituted "a conspiracy to violate Mr. Noble's civil rights." *Id.* at 405. Subsequently, Perkins met with Stevens and CSH nursing director Dorothy Dowe, who persuaded Perkins to produce a statement in response to Cain's findings. Perkins complied, submitting a statement on February 25, 1991 which praised Stevens. Perkins later testified that she produced the statement in order to save her job. Nichols, however, claimed that Perkins recanted her allegations. J.A. at 381 (Nichols Dep.). On March 14, 1991, the Department of Licensing and Regulation issued a report which concluded that the charges against Stevens were meritless.

On January 8, 1992, Noble filed a § 1983 Complaint in the United States District Court for the Eastern District of Kentucky. On October 7, 1992, he filed an Amended Complaint, alleging that Defendants forcibly medicated him in violation of his substantive and procedural due process rights under the Fourteenth Amendment. Noble's Complaint further stated that Defendants violated his First Amendment right to free speech by retaliating against him for filing grievances on his behalf and assisting others in doing so. Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, Defendants moved for dismissal for lack of subject matter jurisdiction. Defendants argued that Noble provided no facts or evidence to prove that they had violated his clearly established rights. The district court overruled Defendants' Motion, concluding that Noble had asserted violations of clearly established constitutional law and that he had established the existence of genuine issues of material fact that warranted allowing his claim to proceed. J.A. at 113–14. This appeal followed.

## II.

■ Defendants appeal the district court's denial of their Rule 12(c) motion to dismiss the case for lack of subject matter jurisdiction on the pleadings. Where, as here, the district court decides the motion on grounds outside the pleadings, the motion is converted into one of summary judgment. Fed. R.Civ.P. 12(c); *see also English v. Dyke,* 23 F.3d 1086, 1091 (6th Cir.1994). We review a district court's denial of summary judgment on the basis of qualified immunity *de novo. Williams v. Kentucky,* 24 F.3d 1526, 1532 (6th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 358, 130 L.Ed.2d 312 (1994).[2]

### A.

■ Qualified immunity is an affirmative defense to § 1983 liability. *Dominque v. Telb,* 831 F.2d 673, 676 (6th Cir.1987). Under the qualified immunity doctrine, "government officials performing discretionary functions generally are shielded from liability or civil damages insofar as their conduct does not violate *clearly established* statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727,

**2.** Defendants' preliminary argument is that Noble has failed to state a claim. Schmitt's Br. at 18–21. We realize we must decide this issue before we determine whether Noble's constitutional rights were clearly established at the time of the violation. *See Blair v. Meade,* 76 F.3d 97, 100 (6th Cir.1996). We find that Noble has adequately stated a claim for relief.

2738, 73 L.Ed.2d 396 (1982) (emphasis added). In order to assert a violation of a "clearly established" right and defeat a qualified immunity claim, "the contours of that right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). In other words, "in the light of pre-existing law the unlawfulness must be apparent." *Id.; see also Danese v. Asman,* 875 F.2d 1239, 1242 (6th Cir.1989), *cert. denied,* 494 U.S. 1027, 110 S.Ct. 1473, 108 L.Ed.2d 610 (1990). A defendant who invokes the qualified immunity defense must present facts which, if true, would entitle him to immunity. *Poe v. Haydon,* 853 F.2d 418, 425 (6th Cir.1988), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989). Preferably, the claimant will make factual allegations in his complaint which are sufficient to establish a violation of clearly established law before the qualified immunity issue arises. *Dominque,* 831 F.2d at 676. If, however, the claimant has not done so, and the defendant then invokes qualified immunity, the court must allow the claimant the opportunity to present additional facts which "show not only violations of constitutional rights, but also that these rights were so clearly established when the acts were committed that any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct." *Id.* (citing *Anderson,* 483 U.S. at 637–39, 107 S.Ct. at 3037–39). The claimant will defeat a qualified immunity defense if he can produce sufficient evidence after discovery to prove the existence of genuine issues of material fact regarding the issue of immunity, or if the undisputed facts show that defendant violated his clearly established rights. *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). In determining whether the defendant is entitled to qualified immunity, the district court should "set forth with precision the basis for its decision." *Poe,* 853 F.2d at 426.

Noble has alleged that the Defendants violated his First and Fourteenth Amendment rights by taking adverse action against him without justification and in retaliation for his contentious behavior while at Grauman. We believe that he has sufficiently asserted violations of clearly established law, and that he has presented genuine issues of material fact in that regard. As a result, we believe that the district court properly denied Defendants qualified immunity.

**B.**

Noble's first allegation, which arises out of the December 16, 1990 incident, states that Defendants violated his rights to substantive and procedural due process. He claims that Defendants lacked the authority to administer antipsychotic drugs and restraints and that the circumstances did not vest them with emergency authority to do so. It is undisputed that Noble retains liberty interests to be free from the conduct alleged. Involuntary commitment to a mental institution substantially restricts individual liberty in many respects, one of which is allowing the state to subject the individual to compulsory treatment. *Vitek v. Jones,* 445 U.S. 480, 491–92, 494, 100 S.Ct. 1254, 1262–63, 63 L.Ed.2d 552 (1980). Certain freedoms, however, survive incarceration. The Supreme Court has held that individuals in state custody enjoy protectable liberty interests to be free from bodily restraint, and to refuse medical treatment such as the administration of antipsychotic drugs. *Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 278, 110 S.Ct. 2841, 2851, 111 L.Ed.2d 224 (1990) (citing *Vitek,* 445 U.S. at 494, 100 S.Ct. at 1264); *Youngberg v. Romeo,* 457 U.S. 307, 316, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982); *Washington v. Harper,* 494 U.S. 210, 221, 110 S.Ct. 1028, 1036, 108 L.Ed.2d 178 (1990).

In the instant case, Kentucky law also establishes reasonable expectations of liberty from such measures which merit due process protection. *Cf. Harper,* 494 U.S. at 221, 110 S.Ct. at 1036; *Vitek,* 445 U.S. at 488, 100 S.Ct. at 1261. Kentucky statutory law explicitly declares that hospitalized patients enjoy the right to refuse medical treatment as well as the right "to be free from unreasonable use of seclusion and restraint." Ky.Rev. Stat.Ann. § 202A.191(h) & (i). Therefore,

the liberty interests which Noble invokes are firmly grounded in both the federal Constitution and state law.

■ Although Noble's liberty interests are clearly identifiable under both the Constitution and state statutory law, we must assess the extent of the procedural process due before we may determine whether the conduct alleged constitutes a violation of those interests. This requires us to balance Noble's interests against the countervailing interests of the state. *Cruzan*, 497 U.S. at 278, 110 S.Ct. at 2851; *see also Youngberg*, 457 U.S. at 320–21, 102 S.Ct. at 2460–61. The Court has recognized that while the mental patient enjoys profound liberty interests, it has also noted that "[w]here an inmate's mental disability is the root cause of the threat he poses to the inmate population, the State's interest in decreasing the danger to others necessarily encompasses an interest in providing him with medical treatment for his illness." *Harper*, 494 U.S. at 225–26, 110 S.Ct. at 1039. Thus, the state may administer involuntary medical treatment to an institutionalized mental patient if that patient poses a threat to himself or other patients, or if treatment is in that patient's medical interest. *Id.* at 227, 110 S.Ct. at 1039–40.

■ Here, Noble alleges that Defendants involuntarily restrained him and medicated him without justification. He asserts that Schmitt lacked authority to restrain him, and that an emergency situation did not exist so as to justify a generic intervention with involuntary medication. Rather, he claims that Schmitt was predisposed to take adverse action against him and that she intentionally provoked him to act out so that she could take such action under the pretext of an "emergency situation." *See* Noble's Br. at 14–16. We believe that reasonable officials could agree that such conduct is unconstitutional. Furthermore, as the district court recognized, several genuine issues of material fact remain as to Schmitt's conduct. J.A. at 111–12. Thus, Defendants are not entitled to qualified immunity from liability on Noble's Fourteenth Amendment claim.

### C.

■ Noble's second argument is that Defendants retaliated against him for filing grievances on his own behalf and for fellow inmates. This alleged conduct also comprises a violation of clearly established constitutional law. As an individual in the custody of the state, Noble retains his rights to free speech, and is entitled to petition the state for redress of grievances. *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974); *Wolfel v. Bates*, 707 F.2d 932, 933 (6th Cir.1983). The ambit of those rights, however, must be measured with regard to the legitimate needs of the particular institution. *Wolfel*, 707 F.2d at 933.

■ Here, Noble claims that Defendants restricted his privileges after he filed a considerable number of grievances against them. He further alleges that Defendants' conduct was motivated by personal animosity towards him and not by furtherance of legitimate rehabilitative or administrative goals. Such conduct is so clearly proscribed by constitutional precedent that reasonable officials would agree that it is improper. *See Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039.

The district court again found genuine issues of material fact regarding whether the alleged conduct actually occurred. Although Defendants claim that their actions were necessary to prevent Noble from agitating other Grauman patients and disrupting treatment, Noble avers that he was justified in filing the grievances, and that his fellow patients sought his help in filing similar grievances. Therefore, Noble's First Amendment claim also survives Defendants' qualified immunity defense.

### III.

Defendants' primary arguments on appeal are factual. They contend that their conduct was permissible under case precedent and that Noble's evidence does not support his allegations to the contrary. We cannot entertain such arguments.

Since *Forsyth*, a district court's denial of qualified immunity has been treated as a "final decision" for the purposes of 28 U.S.C. § 1291. *Forsyth*, 472 U.S. at 530, 105 S.Ct.

at 2817. The court extended this status to qualified immunity decisions because such decisions are otherwise unreviewable after the court proceeds to the merits of the claim. *Id.* at 528, 105 S.Ct. at 2816–17. At the same time, the *Forsyth* court took great pains to point out that "a claim of immunity is conceptually distinct from the merits of the plaintiff's claim that his rights have been violated." *Id.* Subsequently, the Court concluded that in dealing with qualified immunity appeals, the reviewing court's task is purely legal: it must determine "whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions." *Id.*

Last year, the Court more clearly defined the separability principle with regard to *Forsyth* appeals in *Johnson v. Jones,* —— U.S. ——, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). Resolving a split between the circuits, the *Johnson* Court held that issues regarding the sufficiency of the evidence are not immediately appealable in the context of a *Forsyth* appeal. *Id.* at ——, 115 S.Ct. at 2156. Taking its cue from *Forsyth,* the Court explained:

> [A]lthough sometimes practically intertwined with the merits, a claim of immunity nonetheless raises a question that is significantly different from the questions underlying plaintiff's claim on the merits (*i.e.,* in the absence of qualified immunity).
>
> Where, however, a defendant simply wants to appeal a district court's determination that the evidence is sufficient to permit a particular finding of fact after trial, it will often prove difficult to find any such "separate" question—one that is significantly different from the fact-related issues that likely underlie the plaintiff's claim on the merits.

*Id.* at ——, 115 S.Ct. at 2157 (citations omitted). The Court then rejected the defendants' claim that they were entitled to qualified immunity because the evidence was insufficient to prove the claimant's allegations, reasoning that to allow defendants to lodge such arguments in a *Forsyth* appeal "would more than relax the separability requirement—it would in many cases simply abandon it." *Id.* It further noted that relaxing *Forsyth*'s separability requirements would contravene the intent and purpose of *Forsyth* appeals by requiring appellate courts to review the trial record, thereby creating delay. *Id.* at ——, 115 S.Ct. at 2158. Thus, it concluded that "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of material fact for trial." *Id.* at ——, 115 S.Ct. at 2159.

Defendants' *Forsyth* appeal in this case presents the precise evidence sufficiency issues that the Court declined to entertain in *Johnson.* They argue that Noble's evidence does not prove that Schmitt forcibly medicated and restrained Noble, that Stevens formed a strategy to provoke Noble to act out, or that Defendants restricted Noble's privileges to retaliate against him for filing grievances against them. This " 'we didn't do it' " argument is irrelevant to this appeal. *Johnson,* —— U.S. at ——, 115 S.Ct. at 2154 (quoting Jones v. *Johnson,* 26 F.3d 727, 728 (7th Cir.1994)). It falls to the trier of fact to decide whether Noble's allegations are true. To hold otherwise would allow this court to decide prematurely the merits of Noble's claim. For these reasons, Defendants' appeal must fail.

## IV.

In conclusion, we find that Noble has asserted violations of clearly established rights under the First and Fourteenth Amendments. We also agree with the district court that Noble has presented several genuine issues of material fact regarding whether Defendants improperly abridged those rights. Finally, we find that Defendants' claims of qualified immunity, insofar as they pertain to the factual disputes which arose in district court, are not appealable under *Johnson.* For the reasons hereinabove stated, we **AFFIRM** the district court's denial of qualified immunity to Defendants.