George WYSINGER, Plaintiff,

v.

CITY OF BENTON HARBOR, A Michigan Governmental Entity; Emma Hull, Individually and in her official capacity as Mayor of the City of Benton Harbor; Ralph Crenshaw; Ricky Hull; Hersey McKenzie; James Turner; Norval Weiss; Steve Wooden; Charles Yarborough, individually and in their official capacities as Commissioners of the City of Benton Harbor; David Walker, individually and in his official capacity as Public Safety Director of the City of Benton Harbor; and Ron Singleton, individually and in his official capacity as Chief of Police of the Benton Harbor Police Department, Defendants.

No. 4:96 CV 187.

United States District Court,
W.D. Michigan.

June 20, 1997.

Richard D. Stroba, Ford, Kriekard, Domeny & Byrne, Portage, MI, for Plaintiff.

Thomas R. Wurst, Smith, Haughey, Rice & Roegge, Grand Rapids, MI, for Defendants.

## OPINION

ENSLEN, Chief Judge.

Plaintiff George Wysinger, a Commissioner of the City of Benton Harbor, brings suit under 42 U.S.C. § 1983 against the City of Benton Harbor and several of its elected and appointed officials, alleging that defendants deprived him of his rights under the First, Fourth, Fifth and Fourteenth Amendments. This matter is before the Court on defen-

dants' motion for summary judgment filed pursuant to Federal Rule of Civil Procedure 56. Upon review, the Court finds that no genuine issues of material facts remain for resolution on plaintiff's federal claims. Consequently, summary judgment is granted in favor of defendants on those claims and plaintiff's complaint is dismissed.

## A. BACKGROUND

The undisputed facts are as follows: The City of Benton Harbor periodically conducts public meetings of the Board of City Commissioners, during which time both members of the community and the commissioners raise issues of public concerns for discussion. Pursuant to Article II of the Benton Harbor City Code, the Mayor, as presiding officer over these meetings, is duty-bound to preserve order during these meetings and is the sole individual empowered to decide all questions of order. BENTON HARBOR, MICH., CODE § 2–16(a) & (b). All who participate in City Commission meetings are obliged to adhere to rules of conduct and procedures set out in § 2–19.

In 1994, at one such meeting, Commissioner Wysinger was given the floor by Mayor Emma Hull to ask a staff member a question. After the question was asked and answered, Wysinger began to speak again. The Mayor then addressed Mr. Wysinger by name twice, and stated: "Thank you. You already asked that question." Despite the Mayor's efforts to interject, Mr. Wysinger continued to speak. The Mayor then pounded her gavel and declared Mr. Wysinger "out of order." Mr. Wysinger continued to speak, however. The Mayor again pounded her gavel and again declared Mr. Wysinger "out of order." Again, Mr. Wysinger continued to speak. The Mayor pounded her gavel a third time, declaring Mr. Wysinger "out of order" one last time, and instructed David Walker, the Director of Public Safety, to "get him out of here." Mr. Walker then told Mr. Wysinger he was under arrest and escorted him from the meeting. No prosecution resulted from this initial event.

In 1995, a similar episode occurred. During another such public meeting, the Mayor again recognized Mr. Wysinger and gave him the floor to ask a question of a staff member. A lengthy discussion ensued. After the exchange went on for some time, the Mayor interjected and attempted to regain control of the discussion. Mr. Wysinger then accused the Mayor of only interrupting discussions when he was speaking, although earlier that same night she had interrupted another commissioner on two occasions to return the floor to Mr. Wysinger. Wysinger also asserted that he had questions which he needed resolved before he could vote on this matter. The Mayor responded that she wanted his questions answered, but that he should have attended the committee meetings where these issues were discussed. She then instructed Mr. Wysinger to "Go ahead (inaudible), but make it brief please[.]" Rather than continue with his questions, Mr. Wysinger then stated: "I'm not going to no committee meetings. Anytime you have a vote, you have a question, and I'm asking a damn question. Now, I don't have to ask no damn questions." The following colloquy ensued:

MAYOR HULL: Chief, you hear that?

WYSINGER: So you can ...

MAYOR HULL: Now, don't let me.

WYSINGER: I don't care—I don't care about the chief. The Chief got—his boys got their butts kicked last week.

MAYOR HULL: You out of order.

WYSINGER: Maybe I am out of order.

MAYOR HULL: You out of order.

WYSINGER: Maybe I am.

MAYOR HULL: And you out of order. Now.

WYSINGER: So what? So what?

MAYOR HULL: ... Chief, out of here.

In the moments that followed the Mayor instructed the City Manager to tell the Chief of Police to "Escort him out." Chief Singleton then asked him to leave several times, but Commissioner Wysinger would only ask "why?" and "Am I under arrest?" Finally, when Chief Singleton told him he was under arrest, Wysinger responded "Okay" and left the meeting peaceably. Eventually, plaintiff was tried by a jury and acquitted of the charges brought against him.

On September 17, 1996, plaintiff filed the instant action against the City of Benton Harbor, Mayor Emma Hull, the entire Board of Commissioners of the City of Benton Harbor, Public Safety Director David Walker, and Chief of Police Ron Singleton, alleging that the defendants' actions and, in the case of the other commissioners, their failure to act, violated plaintiff's First, Fourth, Fifth, and Fourteenth Amendment rights, constituted multiple state torts, and violated the Michigan Open Meetings Act.

## B. STANDARD

In reviewing a motion for summary judgment, this Court will only consider the narrow question of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A motion for summary judgment requires that the Court view the " 'inferences to be drawn from the underlying facts ... in the light most favorable to the party opposing the motion.' " *Matsushita Electric Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)). The opponent, however, has the burden of showing that a "rational trier of fact [could] find for the non–moving party [or] that there is a *'genuine issue for trial.'* " *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. "The mere existence of a scintilla of evidence in support of plaintiff's position [however] will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

## C. ANALYSIS

Plaintiff alleges that, in ejecting him from these two public meetings, defendants violated plaintiff's clearly established constitutional rights to free speech, to be free from governmental retaliation for exercising his free speech rights, and to be free from unreasonable seizures.[1] Plaintiff asserts that the allegations that he was out of order are baseless and that these ejectments were part of a retaliatory pattern of action designed to silence a political opponent.

Defendants counter that they are entitled to summary judgement for several reasons. First, the individual defendants assert that they are entitled to both absolute and qualified immunity on plaintiff's federal claims. Second, defendants argue that, even if they were not entitled to immunity from plaintiff's § 1983 claim, plaintiff has failed to raise a genuine issue of material fact as to the violation of his constitutional rights. Finally, defendants maintain that they are all absolutely immune from plaintiff's state tort claims under Michigan law.

### 1. Section 1983 Claim

■ 42 U.S.C. § 1983 confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *See Burnett v. Grattan*, 468 U.S. 42, 44 n. 2, 104 S.Ct. 2924, 2926 n. 2, 82 L.Ed.2d 36 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). Section 1983 is not, however, a source of substantive rights in itself. *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 811–12, 127 L.Ed.2d 114 (1994). Consequently, to state a claim under this section, "plaintiff must establish: 1) that he was deprived of a right secured by the Constitution or laws of the United States and 2) that he was subjected to or caused to be subjected to this deprivation by a person acting under color of state law." *Searcy v. City of Dayton*, 38 F.3d 282 (6th Cir.1994) (citing *Flagg Bros. v. Brooks*, 436 U.S. 149, 155, 98 S.Ct. 1729, 1732–33, 56 L.Ed.2d 185 (1978)). Presentation of genuine issues of material fact on these elements will not, however, preclude summary judgment if defendants are immune from suit.

### a. Absolute Immunity

■ The doctrine of absolute immunity affords certain public servants protection from

---

1. The Court notes that plaintiff has declined to address several of the constitutional claims challenged by the defendants in their motion for summary judgment. *See infra* section C(1)(b)(iii).

suits for money damages arising out of their official acts. *Clinton v. Jones,* —— U.S. ——, ——, 117 S.Ct. 1636, 1643 (1997). In cases involving state prosecutors, legislators, and judges the Supreme Court has repeatedly noted that: "immunity serves the public interest in enabling such officials to perform their designated functions effectively without fear that a particular decision may give rise to personal liability." *Id.* In order to effectuate that goal, courts are instructed to review the question of immunity early in the proceeding.

■ While the Supreme Court has not yet stated whether absolute immunity extends to local legislative officials, it is poised to render a decision which could alter the legal landscape in this area. On June 9, 1997, the Court issued an order granting certiorari in *Bogan v. Scott–Harris,* —— U.S. ——, 117 S.Ct. 2430, instructing the parties to brief the following issue: "Are individual members of a local legislative body entitled to absolute immunity from liability under 42 U.S.C. § 1983 for actions taken in a legislative capacity?" *Id.,* —— U.S. ——, 117 S.Ct. 2430. Because the *Bogan* decision could effect this Court's ruling on the issue of immunity, a stay would be appropriate in this case. However, since resolution of the absolute immunity question will not effect the ultimate outcome in this case (because defendants are, nonetheless, entitled to qualified immunity), the Court elects to proceed and decide this case on alternative grounds.

**b. Qualified Immunity**

■ Qualified immunity, like absolute immunity, is an affirmative defense to § 1983 liability for government officials, though not for municipalities. *Noble v. Schmitt,* 87 F.3d 157, 160 (6th Cir.1996). As a general rule, "government officials performing discretionary functions [ ] are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." ' *Dickerson v. McClellan,* 101 F.3d 1151, 1157 (6th Cir.1996) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). "The question of whether an official may nevertheless be held personally liable for an allegedly unlawful action turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules as they existed at the time the action was taken." *Stack v. Killian,* 96 F.3d 159, 161 (6th Cir. 1996) (citing *Harlow,* 457 U.S. at 818–19, 102 S.Ct. at 2738–39).

■ The qualified immunity analysis is, thus, a two-part inquiry: first, the Court must determine whether, based on the applicable law, a genuine issue of fact has been raised as to the existence of a constitutional violation, and second, whether the defendant officials should have known their actions were in violation of that constitutional right. *See Dickerson,* 101 F.3d at 1157–58. Because the first prong of this test and the test for § 1983 liability are the same, a failure to articulate a constitutional injury will result in the dismissal of the plaintiff's federal claims as to all of the defendants.

i. *First Amendment Claims*

Plaintiff raises two distinct constitutional claims based on the exercise of his First Amendment rights. Plaintiff argues, first, that he was denied his right to speak freely and represent his constituents at the two public meetings by being removed from those meetings. Plaintiff also alleges that his ejectment from those meetings constituted retaliation for stating his contrary political views earlier in the meetings and at unspecified times previous to those meetings. While both claims stem from plaintiff's alleged exercise of his First Amendment rights, they require different analyses. Consequently, the Court will contend with each of them in turn.

■ While it is undeniable that the First Amendment envisions the "uninhibited, robust, and wide-open" debate of public issues, it is also beyond doubt that the freedom of speech is not absolute. *Frisby v. Schultz,* 487 U.S. 474, 479, 108 S.Ct. 2495, 2499–2500, 101 L.Ed.2d 420 (1988) (citations omitted). Even protected speech may be restricted by reasonable time, place and manner regulations. *Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661

(1989) (citing *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3068–69, 82 L.Ed.2d 221 (1984)). Where speech is curtailed in accordance with one such reasonable restriction, no constitutional violation occurs.

In the instant case, plaintiff does not challenge the validity of the Benton Harbor City Code. Thus, plaintiff's claims that his free speech rights were impaired will only survive if the defendants went beyond the ordinance's scope in enforcing the rules of conduct against plaintiff. The ordinance in question, section 2–19 of the City Code, entitled Rules of Conduct, states in pertinent part:

> When the chair determines or when it is proposed by another commissioner that an orator's comments ... disrupt the good order of the meeting, the chair may declare that the orator is "out of order" and that the speaker has forfeited the right to the floor. Once properly ruled out of order, the right to speak has been relinquished. If the speaker apologizes and amends his comments, the chair may then return the speaker's rights to the floor. A second declaration of "out of order" means the speaker relinquishes the floor without appeal. *If the speaker refuses to yield the floor by continuing to speak, a disturbance or a breach of the peace is being committed* and the person is, therefore, guilty of a misdemeanor and *may be forcefully removed from the meeting and, if necessary, arrested.* The chair then exercises the prerogative to have the commissioner removed.

BENTON HARBOR, MICH., CODE § 2–19(f) (emphasis added). A "disturbance" is further defined at § 2–19(d)(3) as: "an interruption of the peace and quiet, a violation of public order and decorum which interferes with or hinders the lawful body and the pursuit of its right or occupation." A "breach of the peace" is "something short of the actual threat of violence or the act of violence, which in some way actually disturbs the peace and order of the meeting." § 2–19(d)(1).

■ Here, the undisputed facts match the scenario set out in subsection (f) precisely. Plaintiff Wysinger, on both occasions spoke out of turn, and ignored the Mayor's efforts to regain control of the floor, continuing to speak until he was ruled out of order. When plaintiff Wysinger continued to speak after the *second* ruling that he was out of order, he clearly violated § 2–19(f). While plaintiff asserts that he was guilty of neither a disturbance nor a breach of the peace, he does not deny the above-listed facts, nor does he assert facts to the contrary. Upon review of the audio tapes of the two meetings submitted by defendants (the authenticity of which plaintiff has not challenged) and based on the transcript of a portion of the second meeting submitted by plaintiff, the Court finds that, at the very least, the Mayor adhered to a valid ordinance in ejecting Commissioner Wysinger and that no reasonable jury could find on these facts that she acted beyond the scope of that ordinance. Moreover, the fact that a jury did not convict Mr. Wysinger of these charges for whatever reason does not impact the Court's analysis in this regard. On the basis of the undisputed evidence presented, the Court finds that no material issue of fact exists as to whether plaintiff's ejectment in itself infringed on his free speech rights. It did not.

■ Plaintiff asserts, however, that his ejectment was unconstitutional because it was motivated by political animus. Plaintiff claims that he was removed from the meetings, not because he was speaking persistently out of turn, but because of his contrary views and criticism of legislation presented for comment at the meetings in question and on previous, unspecified occasions. Looking to Supreme Court and Sixth Circuit case law exclusively, the Court finds that it is well-established that: " 'retaliation by public officials against the exercise of First Amendment rights is itself a violation of the First Amendment.' " *McBride v. Village of Michiana,* 100 F.3d 457, 462 (6th Cir.1996) (quoting *Fraternal Order of Police Lodge No. 121, Inc. v. City of Hobart,* 864 F.2d 551, 553 (7th Cir.1988)); *see also Mount Healthy City Sch. Dist. Board of Education v. Doyle,* 429 U.S. 274, 283–84, 97 S.Ct. 568, 574–75, 50 L.Ed.2d 471 (1977). To prevail on a retaliation claim, plaintiff must prove that retaliation against

plaintiff's constitutionally protected speech was a "motivating" or "substantial" factor in producing defendants' actions. *Mt. Healthy*, 429 U.S. at 284, 97 S.Ct. at 574.[2]

■ While direct evidence of retaliatory intent is, of course, not required to survive a motion for summary judgment, plaintiff must at least present some facts from which one might infer that retaliation was the motivating force behind defendants' actions. Plaintiff, however, presents no such evidence. Instead, he merely asserts that because he was ejected twice[3] and because he had different views from his co-commissioners, they must have been retaliating against him. Plaintiff argues that the Mayor treated him differently from the other commissioners in that she gave them greater latitude to speak and never enforced the rules against them. The evidence presents a different picture, however. The audiotapes reveal that Mayor Hull did, in fact, interrupt other commissioners on two occasions on the evening of April 17, 1995, to return the floor to plaintiff Wysinger. Furthermore, Mayor Hull made several efforts to accommodate Mr. Wysinger. Indeed, the only conclusion supported by the record is that Mayor Hull controlled the meetings in a very even-handed manner. As further proof of Mayor Hull's unbiased conduct, the Court notes that early in the evening on August 24, 1996, she stopped the meeting at a point when various commissioners and citizens had been speaking to state that she would not tolerate speaking out of turn or disrespect. She warned that **anyone** violating the rules of conduct would be ejected from the meeting if such conduct were to continue. For some unknown reason, plaintiff points to this event as evidence that Mayor Hull was out to get him. The Court finds, on the contrary, that a reasonable jury could not see it as such. The Court, therefore, finds that plaintiff has failed to raise a genuine issue of material fact on his retaliation claim as well.

### ii. *Fourth Amendment*

■ Likewise, plaintiff's claim that his arrests were illegal is without support. Plaintiff argues that because the Chief of Police testified he only arrested plaintiff after he was ordered to do so by Mayor Hull and a jury found him not guilty of any criminal violations, the arrest was illegal. Plaintiff does not, however, provide any legal support for this argument. Given that the arresting officer was present when plaintiff apparently committed a misdemeanor, this Court can discern no constitutional principle upon which this claim may be based. Consequently, plaintiff's Fourth Amendment claim must also be dismissed.

### iii. *Other Constitutional Claims*

The Court notes that plaintiff raised several other vague constitutional claims based on substantive and procedural due process viola-

2. Given that there is some confusion within the Sixth Circuit regarding the proper standard for retaliation claims, the Court takes a moment to review the conflicting case law. Until recently, the Sixth Circuit reviewed retaliation claims under a substantive due process rubric, requiring that a defendant's actions "shock the conscience" before liability would be imposed. *Cale v. Johnson*, 861 F.2d 943, 949 (6th Cir.1988). Of late, however, several courts have abandoned that analysis, requiring only that retaliation be the motivating factor in producing defendants' actions. *McBride v. Village of Michiana*, 100 F.3d 457, 462 (6th Cir.1996); *Thaddeus-X v. Blatter*, 110 F.3d 1233 (6th Cir.1997); *Zilich v. Longo*, 34 F.3d 359 (6th Cir.1994); *Spruytte v. Govorchin*, 961 F.Supp. 1094 (W.D.Mich.1997). The Circuit's decisions have not been consistent in this regard, however. Most cases dealing with retaliation claims by prisoners have required that the retaliatory actions alleged rise to the level of an "egregious abuse of governmental power."

Furthermore, in an opinion filed June 18, 1997, the Sixth Circuit unequivocally rejected a prisoner's assertion that the "shocks the conscience" standard should no longer be applied to retaliation claims. *McLaurin v. Cole*, 115 F.3d 408 (1997). However, in a compelling concurrence, Judge Ryan argued the majority's "analytical route" was simply incorrect. Thus, it appears the matter is not settled, particularly in non-prisoner cases. The Court need not attempt to resolve the debate, however, since plaintiff's claim far from meets either standard.

3. Plaintiff asserts that his ejectment by a previous Mayor from a public hearing in 1987 is also evidence of an ongoing pattern of retaliation. Given that the principal actor in the two situations were different—that is, the officer doing the ejecting in this case was Mayor Hull and in the previous case was Mayor Wilce Cooke—the Court does not find the events in 1987 relevant.

tions which he has chosen to abandon. Despite the fact that defendants have met their burden to allege facts sufficient to challenge all of plaintiff's claims, plaintiff has failed to meet his burden to support his due process claims. Consequently, pursuant to Rule 56, summary judgment must be granted in favor of defendants on those claims as well.

Having found that plaintiff has failed to demonstrate a genuine issue of material fact as to the existence of any constitutional injury, the Court is required to dismiss plaintiff's federal claims as to all defendants. The "substantive" rejection of plaintiff's claims effectively disposes of the qualified immunity issue and any questions regarding § 1983 liability.

### 2. State claims

Having dismissed plaintiff's federal claims, the only means by which the Court can retain jurisdiction over plaintiff's state claims is to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Under that section, the district court may decline to exercise supplemental jurisdiction over a claim if it "has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3). " '[I]f, however, the federal claims are dismissed before trial, ... the state claims [generally] should be dismissed as well.' "*Taylor v. First of Am. Bank–Wayne,* 973 F.2d 1284, 1287 (6th Cir.1992) (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)). The Court, therefore, in its discretion, dismisses plaintiff's state claims.

### D. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment and orders his federal claims dismissed with prejudice. Furthermore, having declined to exercise supplemental jurisdiction over plaintiff's state claims, the Court also dismisses plaintiff's state claims.