C.E. "Sonny" SCROGGINS, Verlene Scroggins, Sharifa Scroggins–Britt, and Sakar Scroggins, Plaintiffs,

v.

CITY OF TOPEKA, KANSAS, Defendant.

No. 96–4031–SAC.

United States District Court, D. Kansas.

Feb. 2, 1998.

Michael F. Broemmel, Broemmel Law Office, Debra A. Haimowitz, Topeka Area SRS, Topeka, KS, for plaintiffs.

David D. Plinsky office of City Attorney Topeka, KS, for defendant.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This First Amendment case comes before the court on the defendant City of Topeka's motion for summary judgment. (Dk.22). The plaintiffs bring this suit alleging their First Amendment rights were violated when they were escorted out of a City Council meeting without completing their comments on the Mayor's appointment of Cecil Washington to the Mayor's Commission on Families. The defendant City argues it is entitled to summary judgment as the uncontroverted facts establish the non-discriminatory and rational enforcement of the City Council's rules that impose relevancy limits and bar personal attacks against individuals. The City defends these restrictions as narrowly tailored to achieve its legitimate governmental interests in having orderly and efficient meetings and in preventing the disruption of their meetings.

## I. SUMMARY JUDGMENT STANDARDS

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade

a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.,* 849 F.2d 1269, 1273 (10th Cir.1988).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to" the nonmovant's claim or position. *Martin v. Nannie and Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348; it requires " 'present[ing] sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.' " *Thomas v. International Business Machines,* 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Industries, Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991)). The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.,* 45 F.3d 357, 363 (10th Cir. 1995).

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit*

*Ins.*, 805 F.2d 342, 346 (10th Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

## II. STATEMENT OF UNCONTROVERTED FACTS

Around May 23, 1994, the Mayor of Topeka announced that he had appointed a "Commission on Families" having as its purpose the study, evaluation, and recommendation of family issues in today's society. The Mayor appointed certain Topeka residents to this commission. One of those appointed was Cecil Washington, a pastor of a Topeka-area church. The plaintiffs [1] and the Wounded Sheep Ministries organization opposed Washington's appointment to the commission.[2]

Prior to August of 1993, the plaintiff C.E. Scroggins told Mayor Felker that his family "had been devastated by Cecil Washington." In August of 1993, C.E. Scroggins wrote a letter and distributed copies of it "everywhere" in an effort to communicate the level of hurt and emotional outrage his family had felt as a result of Washington's actions. A copy of this letter was sent to Mayor Felker. In addition, C.E. Scroggins personally shared these same feelings with former Police Chief Beavers, the Sheriff Dave Meneley, the Mayor's wife, and all members of the City Council at that time. The plaintiff C.E. Scroggins even went to the media, including television and radio stations and newspapers, "in an effort to stop Cecil Washington." In April or May of 1994, the plaintiff Verlene Scroggins discussed with Mayor Felker her own personal feelings about Cecil Washington.

Because of what he believed were abuses of pastoral authority by Cecil Washington, C.E. Scroggins was outraged when he learned that the Mayor had appointed Washington to the Commission on Families. As a result, C.E. Scroggins compiled and distributed a packet of documents which were intended to evidence the wrongs that Washington had committed. The material was distributed to Police Chief Beavers, Sheriff Dave Meneley, Mayor Felker and to all council members at the time. According to

C.E. Scroggins, all of the plaintiffs' concerns with Washington's appointment were contained in that packet of documents. Consequently, prior to the council meeting on June 14, 1994, the plaintiffs had already communicated to the Mayor and City Council their dissatisfaction with Washington's appointment.

Sometime prior to June 14, 1994, C.E. Scroggins met with Barbara Mellen, the Council Administrator for the Topeka City Council. He told Ms. Mellen that he and his family members were going to appear at the public comment section of a council meeting and inform everyone of the adultery between his wife and Washington. Ms. Mellen told C.E. Scroggins that such topics were inappropriate for a public meeting and that he would be humiliating his wife. Mr. Scroggins told Ms. Mellen that they were not ashamed of this matter and that his wife's repentance included public acknowledgment of what she had done. Ms. Mellen reiterated her concern that such highly personal information really had no place in public forums reserved for city government issues. Mr. Scroggins disagreed with her assessment. Ms. Mellen later told Mayor Felker of her same concerns over C.E. Scroggins' intent to discuss this highly personal information at a council meeting.

On June 14, 1994, C.E. Scroggins telephoned the Topeka City Clerk's office. He informed the office that he and the other three plaintiffs wanted to appear during the public comment portion of the council's meeting on June 14, 1994. The memorandum from that telephone call informed Mayor Felker that all of the plaintiffs would make public comments on the "appointment of Cecil Washington to the Mayor's Commission on Family Status."

When C.E. Scroggins went to the council meeting on June 14, 1994, his plans were as follows:

> I planned to talk about Timothy 5:19,20; Matthew 18:15–17 of the Good Book. I planned to talk about him, a felony, forging

---

**1.** The plaintiff C.E. Scroggins and Verlene Scroggins are married, and the remaining plaintiffs are their children.

**2.** This paragraph of facts is taken from the plaintiff's complaint. The defendant admitted all of these allegations in its answer.

people's signatures on checks, opening other people's mail, and the carrying on with my wife and family that he did, and just talk about how violated the trust and how it damaged by family, and we did not want that to happen to any other family. That was our main thing for appearing, to make sure that they were aware and dealing with all of the facts as it related to the appointment of Cecil Washington. (Dk.23, Ex. B, pp. 59–60). The plaintiffs, Verlene and C.E. Scroggins, knew the City Council had a policy and rule prohibiting speakers from making personal attacks on members of the public.

The City Council's rule against personal attacks provided that: "Any person making personal, rude or slanderous remarks, or who becomes boisterous, while addressing the Council shall be requested to leave the meeting and may be at once barred by the presiding officer from further audience before the Council." (Dk.23, Ex. H). The Council's rule on relevancy limits comments "to topics directly relevant to business of the City Council." (Dk.23, Ex. H).

The transcript from the videotaped council meeting on June 14, 1994, reflects the following exchange of comments and events:

> **Mayor Felker:** We are back in open session for public comment. We had four people that called the Clerk's office two people that are here that asked to be recognized this evening. So we'll start. The first person to call in was Sonny Scroggins. Mr. Scroggins.

> **Sonny Scroggins:** Mr. Mayor. In the sweet Name of Jesus I cannot understand why you would appoint Cecil Washington to the Commission on the Status of Families in light of you and the public knowing what he has done to my family and others. Just forget about what he has done to, to, to my family. This man has forged checks and opened other peoples' mail. You know the scripture talks about it and this bible . . . .

> **Councilmember Gary Fleenor:** My Mayor I'm not sure that we should be allowing someone to characterize someone. This isn't . . . this isn't court. This has nothing to do with, with City Council

business. I would request that you monitor the comments.

> **Mayor Felker:** Okay. Thank you. The appointment's mine, and the Council rules forbid personal attacks on . . .

> **Councilmember Gary Fleenor:** On anyone.

> **Mayor Felker:** . . . on anyone.

> Sonny Scroggins:èIt's not a personal attack, it's, it's a matter of record . . . it's a matter of record.

> **[overlapping voices]**

> **Mayor Felker:** It's not a matter of record . . . . If you continue this way, you will be cut off and asked to leave.

> **[overlapping voices]**

> **Sonny Scroggins:** Mayor, did you appoint him to the commission?

> **Mayor Felker:** Yes, I did.

> **Sonny Scroggins:** Now I don't think Fred Phelps had that in mind when he asked you some years ago to appoint some type of commission on the status of families.

> **Mayor Felker:** Mr. Phelps had nothing to do with the formation of this Commission.

> **[overlapping voices]**

> **Sonny Scroggins:** This man . . . . Well let's talk faxes and letters he sent to you at the time that you . . . (interruption)

> **Mayor Felker:** He sent faxes and . . . . Mr. Scroggins we're not going to take this any further at this venue. If you want to go somewhere else with it—fine. But the rules are very clear—we are not going to sit here and listen to a personal attack on anybody.

> **Sonny Scroggins:** Alright. Well this shaddy shepherd that you appointed to . . . .

> **Mayor Felker:** Mr. Scroggins, that's it. You will please cease and desist and we will move on to the next people. Next was Leroy DeWitt.

> **Sonny Scroggins:** No, no . . . you . . . you . . . . The rest of my family . . . .

> **[overlapping voices]**

> **Mayor Felker:** No, I told you. This is your family. Your family is not going to

participate in any kind of personal attack.

**Sonny Scroggins:** ... [inaudible] ... some kind of Mayor. Boy.

**Mayor Felker:** Mr. Scroggins, would you please ....

**Sonny Scroggins:** I'm gone, man, I'm gone.

**Mayor Felker:** Mr. DeWitt.

**Sonny Scroggins:** I hope you're happy. You look like you are. Still doesn't change the facts. He's a shaddy shepherd and a pig. Period.

**Mayor Felker:** Chief, would you please escort them from the room please.

**Sonny Scroggins:** I'm going, Chief.

(Dk.23, Ex. A). As they were being escorted out, none of the plaintiffs represented to the Council that the intentions of Verlene, Sharifa and Sakar did not include the making of personal or character attacks against Washington. Nor did Verlene, Sharifa, or Sakar provide any written comments of their own to the Mayor or Council.

The plaintiff Verlene Scroggins conceded in her deposition that some people would consider her husband's comments on June 14, 1994, to be "a personal attack." (Dk.23, Ex. D, p. 39). Ms. Scroggins also testified that she could understand why Mayor Felker would assume her comments were going to be personal statements about Mr. Washington based on what she had discussed with the Mayor one or two months before the Council meeting.

## III. FREE SPEECH CLAIM

### A. *Claim*

The plaintiffs claim that their statements concerning the appointment of Washington were matters of public concern protected by the First Amendment. They claim that the defendant violated that right when the Mayor prevented C.E. Scroggins from completing his statement and denied the other plaintiffs the opportunity to even begin their statements.

### B. *Arguments*

The defendant argues the public comment portion of the Council meeting is a limited public forum that restricted speakers to relevant topics and prohibited them from making personal attacks. The defendant insists the rule against personal attacks and the rule on relevancy are valid regulations of speech that serve a substantial governmental interest. The defendant characterizes them as rules of decorum needed to run efficient meetings, to maintain a reasonable level of control over speakers who may be emotional individuals dissatisfied and disgruntled with their city leaders and/or municipal policies, and to keep such comments from inciting improper responses from others in attendance. The defendant considers this case to be simply one of enforcing reasonable rules of decorum against obvious violations:

> There can be no doubt that when plaintiff C.E. Scroggins appeared before the Topeka City Council and had begun to make personal attacks on a local minister, and had begun to exhibit open hostility towards a citizen, it became reasonable to control hostile, attacking, personally directed speech by cutting off such comments, especially when the precise nature of the speech had already been communicated to members of the City Council by the speaker and his wife.

(Dk.23, pp. 25–26). The defendant denies any claim of prior restraint for it was only after C.E. Scroggins made the personal attacks that the defendant curtailed any further comments of a similar nature.

In opposing summary judgment, the plaintiffs devote substantial argument to the proposition that three of the them were denied any chance for public debate, that three of them violated no Council rule, and that the Council never inquired of these three whether their comments would be in violation of the Council rule against personal attacks. As for Mr. Scroggins, the plaintiffs argue that his comments were protected by the First Amendment as he believed his comments concerned a matter of public record and as his comments addressed whether an appointee had violated state or federal laws. As for Mr. Scroggins' alleged violation of the Council rule, the plaintiffs take the following position:

> As stated previously, Plaintiffs concur that Defendant can impose reasonable time and place restrictions in regard to the

exercise of speech in relation to Defendant as a public or governmental body. *New Rider v. Board of Ed. of Independent School Dist. No. 1, Pawnee County, Oklahoma*, 480 F.2d 693 (10th Cir.1973), and *Poulos v. State of New Hampshire*, 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105 (1953).

Plaintiffs maintain that the time and place restriction which Defendant attempted to place upon Mr. Scroggins in this matter was not reasonable inasmuch as Mr. Scroggins was not given any opportunity to attempt to comply with formal decorum dictates espoused by the Mayor at the City Council meeting in question. Mr. Scroggins was simply brushed from the podium and swept from the Council chamber.

(Dk.28, p. 18).

### C. *Governing Law*

#### 1. General Framework of First Amendment Claims.

■ The First Amendment provides in part that "Congress shall make no law ... abridging the freedom of speech ...." It, however, remains axiomatic that the freedom of speech is not absolute. A violation of the Free Speech Clause occurs only when the restricted speech is constitutionally protected and when the government's justification for the restriction is insufficient. *See Frisby v. Schultz*, 487 U.S. 474, 479, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). In *Cornelius v. NAACP Legal Defense & Educational Fund*, 473 U.S. 788, 797, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), the Court articulated a three-tiered, forum-based test for determining whether a plaintiff's First Amendment right to free speech was violated. For purposes of this case, the analysis breaks down into the following issues. First, is the plaintiffs' speech protected by the First Amendment? Second, what is the nature of the forum: public, limited public, or nonpublic? Third, do the City's justifications for limiting the plaintiffs' speech satisfy the requisite standard? *See Summum v. Callaghan*, 130 F.3d 906, 913 (10th Cir.1997).

### 2. Protected Speech

The First Amendment's protection of free speech, made applicable to the states through the Fourteenth Amendment, extends to a broad range of speech and expressive conduct. *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 115 S.Ct. 2338, 2344, 132 L.Ed.2d 487 (1995). The First Amendment recognizes "the importance of 'uninhibited, robust, and wide-open' debate on public issues." *Frisby v. Schultz*, 487 U.S. at 479, 108 S.Ct. 2495 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

There seems no dispute here that the First Amendment would protect public debate over the selection process and qualifications of persons selected to serve on the Mayor's Commission on Family Status. The record indicates, however, there may be an appreciable difference between sincere debate of a public issue and what C.E. Scroggins intended to say at the Council meeting that night. There is no evidence that Cecil Washington's appointment to the Mayor's Commission on Families was a current issue before the Council. Based on what C.E. Scroggins told the Council Administrator, the Mayor and others in advance of the meeting, Scroggins principally wanted to reveal personal matters concerning his family and Washington, to attack Washington's character as a result of these matters, and to use this televised public forum as simply another venue for his attack on Washington. In a public employment setting, courts have held:

> "[W]hen a person does initially engage in protected ... speech on matters of a public concern, [he] may not use this protection ... to also level personal attacks on ... officials." *Smith v. Cleburne County Hosp.*, 870 F.2d 1375, 1383 (8th Cir.), *cert. denied*, 493 U.S. 847, 110 S.Ct. 142, 107 L.Ed.2d 100 (1989). When what started out as protected debate turns into "caustic personal attacks" against colleagues in a public service workplace, the speech is no longer deemed relevant to "a matter of public concern," *id.* at 1382, and is therefore not protected under *Connick [v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).] *Id.*

*Dunn v. Carroll*, 40 F.3d 287, 293 (8th Cir. 1994). In a similar vein, the court believes

that the relative importance of the plaintiffs' comments under the First Amendment weakens when the comments become a pretext for carrying out a caustic personal attack on Washington. For purposes of this motion, however, the court will assume the plaintiffs' speech is subject to the fullest protection under the First Amendment.

### 3. Nature of the Forum

■ The second tier of this framework concerns the nature of the forum. Though the Council's meetings are held on public property, "the First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *United States Postal Service v. Council of Greenburgh Civic Associations,* 453 U.S. 114, 129, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981). Rather, "'the state, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.'" *Id.* (quoting *Greer v. Spock,* 424 U.S. 828, 836, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976)). The extent to which government may regulate expressive activity on public property depends upon the "character" of the public property in question. *See Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 44, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

■ The Supreme Court has recognized three types of forums that may exist on government property: traditional public forums, designated public forums, and nonpublic forums. "Traditional public forums are places such as streets and parks that 'by long tradition ... have been devoted to assembly and debate.'" *Church on the Rock v. City of Albuquerque,* 84 F.3d 1273, 1279 (10th Cir.) (quoting *Perry Education Ass'n. v. Perry Local Educators' Ass'n.,* 460 U.S. at 45, 103 S.Ct. 948), *cert. denied,* —— U.S. ——, 117 S.Ct. 360, 136 L.Ed.2d 251 (1996). Designated public forums are those that the government opens "for use by the public at large for assembly and speech, for use by certain

speakers, or for the discussion of certain subjects." *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439. "Thus, designated public forums may be limited in terms of participants and in terms of subject matter." *Church on the Rock,* 84 F.3d at 1278. The nonpublic forum is public property which the government has not opened to public communication either by tradition or by designation. *Perry Education Ass'n.,* 460 U.S. at 46, 103 S.Ct. 948. "When the government allows selective access to some speakers or some types of speech in a nonpublic forum, but does not open the property sufficiently to become a designated public forum, it creates a 'limited public forum.'" *Summum,* 130 F.3d at 916.[3]

Some courts have held that a designated public forum exists when a governmental body affords the public an opportunity to address the body at its meeting. *See, e.g., White v. City of Norwalk,* 900 F.2d 1421, 1425 (9th Cir.1990) (public allowed to speak during Council's discussion of agenda items) (citing in part *City of Madison, Joint School Dist. No. 8 v. Wisconsin Employment Relations Commission,* 429 U.S. 167, 175, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976)); *Jones v. Heyman,* 888 F.2d 1328, 1331 (11th Cir.1989) (members of public were allowed to speak during Commission's discussion of an agenda item if they previously submitted a written request to speak on this item); *Pesek v. City of Brunswick,* 794 F.Supp. 768, 782 (N.D.Ohio 1992) (council opened meeting to public and allowed public to speak on items on the agenda). The Ninth Circuit recently retreated somewhat from the characterization made in *White:*

> [I]n *White* ..., we said that city council meetings, like those of the City of Norwalk, "have been regarded as public forums, albeit limited ones." *Id.* at 1425. However, we did not say that we agreed that those meetings were public fora.... We went on to say that disruptions could be prevented and that a speaker may dis-

---

3. As an example of a "limited public forum," the Tenth Circuit referred to the decision of *United States v. Kokinda,* 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990), in which a plurality of the Court found that a post office sidewalk was "not a purely non-public forum" because the post office had allowed some distribution of leaflets and picketing. "Even so, since the postal

sidewalk did not rise to the level of a designated public forum, the Court proceeded to analyze the regulations banning solicitation 'under the standards set forth for nonpublic fora.'" *Summum v. Callaghan,* 130 F.3d 906, 916 (10th Cir.1997) (quoting *Kokinda,* 497 U.S. at 730, 110 S.Ct. 3115).

rupt a board meeting "by speaking too long, by being unduly repetitious, or by extended discussion of irrelevancies." *Id.* at 1426. With all of those restrictions, the type of forum described looks very much like a nonpublic one....

It seems to us that the highly structured nature of city council and city board meetings makes them fit more neatly into nonpublic forum niche. But, as we intimated in *City of Norwalk,* the important thing is not whether we call the meetings highly regulated limited public fora or nonpublic fora. The fact remains that limitation on speech at those meetings must be reasonable and viewpoint neutral, but that is all they need to be.

*Kindt v. Santa Monica Rent Control Bd.,* 67 F.3d 266, 270–71 (9th Cir.1995).

The Supreme Court's stance on this issue is open to debate. In *City of Madison,* the Court held that a state statute opened the school board meeting to the public and to "direct citizen involvement." 429 U.S. at 175, 97 S.Ct. 421. While recognizing that public bodies may confine meetings to certain subjects and may conduct nonpublic sessions, the Court did not characterize the forum before it but simply held that "the participation in public discussion of public business cannot be confined to one category of interested individuals." *Id.*[4] Still, the Supreme Court in *Perry* did establish the three categories of public property and cited the school board meeting in *City of Madison* as one example of a designated public forum. 460 U.S. at 45, 103 S.Ct. 948.

In the instant case, the defendant generally characterizes the forum as "a limited open forum, limited in that it does not permit or tolerate personal attacks on people" (Dk.23, p. 19), or "a limited public forum for First Amendment analysis" (Dk.23, p. 24). Based on the cases cited by the defendant and the standards applied in those cited cases, the court presumes the defendant is conceding that the public comment portion of the Council meeting was a designated public forum and not a nonpublic forum functioning as a "limited public forum."[5] The plaintiffs do not affirmatively state their position concerning the nature of the forum. For purposes of this motion, the court will characterize the forum as a designated public forum.[6]

4. Standards For Governmental Regulation

Generally speaking, the nature of the forum in which the speech is restricted dictates the level of scrutiny required. *See United States v. Kokinda,* 497 U.S. 720, 726–27, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990). Like a traditional public forum, a government's regulation of speech activity on a designated public forum is examined under strict scrutiny. *Id.* Unlike a traditional public forum, the government "is not required to indefinitely retain the open character" of a designated public forum. *Perry Education Ass'n,* 460 U.S. at 46, 103 S.Ct. 948. But as long as the property is designated for communicative purposes, the government is "bound by the same standards as apply in a traditional public forum." *Id.* Thus, any government regulations that are content-based must be narrowly drawn to achieve a compelling governmental interest. *Id.; see Sum-*

---

**4.** Since *City of Madison* predates *Perry* and its sliding scale of public property categories, the Court in *City of Madison* did not have reason to characterize the forum before it. *Leventhal v. Vista Unified School Dist.,* 973 F.Supp. 951, 957 (S.D.Cal.1997). In his concurring opinion in *Madison,* Justice Stewart emphasized that public bodies have "broad authority to structure the discussion of matters" and that the Court had not been asked in that case "to consider what constitutional limitations there may be upon" this authority. 429 U.S. at 180, 97 S.Ct. 421.

**5.** The Tenth Circuit in *Summum* explains that a "limited public forum" is: "[w]hen the government allows selective access to some speakers or some types of speech in a nonpublic forum, but does not open the property sufficiently to become

a designated public forum." 130 F.3d at 916. The confusion over the meaning of this term is due to the Supreme Court's evolving use of it. In *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), the Supreme Court used "limited public forum" "to denote a particular sub-category of the designated public forum." *Summum,* 130 F.3d at 914. More recently, the Supreme Court has used the same term "to describe a type of nonpublic forum." 130 F.3d at 914.

**6.** This conclusion seems consistent with the Council's apparent purpose for allowing public comments at its meetings, with the Council's permitted use of that forum by the general public, and the Council's apparent intent in creating this forum. *See Summum,* 130 F.3d at 915.

*mum,* 130 F.3d at 914. In addition, any government regulations that are content-neutral may restrict the time, place and manner of the protected speech, as long as the regulation is "narrowly tailored to serve a significant governmental interest" and "leave[s] open ample alternative channels for communication." *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

Neither side articulates its position on whether the City Council's prohibition on personal attacks is a content-based or a content-neutral regulation.[7] The defendant summarizing the facts and holding in *Finch v. City of Vernon,* 877 F.2d 1497, 1507 (11th Cir.1989), notes that "[c]utting off the speaker under disruptive circumstances constituted a 'content neutral restriction.'" (Dk.23, p. 23). The defendant, however, draws no conclusion concerning whether the Council's prohibition on personal attacks or its enforcement of the same against the plaintiffs was a "content-neutral restriction." Besides taking no position on this issue, the plaintiffs do not even mention the standard governing content-based regulations.

■■■■ The restriction of speech is content neutral if it is "justified without reference to the content of the regulated speech.'" *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 295, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism,* 491 U.S. at 791, 109 S.Ct. 2746. "A regulation that serves purposes unrelated to the content of the expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.*

It is clear that the Council's prohibition on personal attacks is not based on the Council's disagreement with any particular message, is unrelated to any particular viewpoint being expressed, and serves purposes unrelated to the particular content of the speech. The Council's rule prohibits personal attacks on anyone, not just City employees or other City officials. *Cf. Leventhal v. Vista Unified School Dist.,* 973 F.Supp. 951, 957 (S.D.Cal. 1997) (district bylaw prohibiting criticism of District employees is a content-based regulation); *Baca v. Moreno Valley Unified School Dist.,* 936 F.Supp. 719, 730 (C.D.Cal.1996) (district policy prohibiting "charges or complaints" against District employees is content-based prohibition). The Council's rule focuses on the inherently disruptive nature of a personal attack in a Council meeting and not on the expressive content of the personal attack. *Cf. United States v. Kokinda,* 497 U.S. at 736, 110 S.Ct. 3115 ("the inherent nature of solicitations" is a "content-neutral ground" for regulating solicitations); *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (ordinance that distinguished adult film theaters from other kinds of theaters was a content-neutral regulation aimed not at the content of the films but at the effects of such theaters on the community). It seems that the Council's rule against personal attacks is a content-neutral regulation of speech. *Cf. Jones v. Heyman,* 888 F.2d at 1331–32 (found that Mayor's removal of a speaker at a commission meeting who was not addressing the current topic and was becoming disruptive was a content-neutral act taken to maintain order over the meeting).

**D.   *Analysis***

■■■■ The court's analysis of this case has been made difficult by the parties' failure to make use of the above legal framework in organizing their issues and arguments. The parties' briefs do identify some of the more relevant decisions from other circuits and discuss generally the facts and holdings in them. The briefs, however, often do not explain their respective positions on the analysis and issues found in those cases. Despite these deficiencies with the briefs, the court believes it understands enough of the parties'

---

7.   Nor does either side announce or analyze its position on the relevancy restriction. Under the facts of this case, the analysis of either restriction appears indistinguishable from the other. For purposes of this motion, the court will discuss only its analysis of the rule barring personal attacks.

arguments that it can decide the pending motion.

The nature and scope of the plaintiffs' claims is another matter that has not been clearly presented. The plaintiffs nowhere challenge the constitutional validity of the Topeka City Council's Code, § A2–25(b), and in particular the Council rules applied here. Rule 5.6 specifically provides:

> **5.6 Public Comment Relevancy** (sic) **Requirement:** The final item of business to come before the City Council at each Council meeting shall be a period for public comment. Public comment shall be limited to topics directly relevant to business of the City Council.

Rule 8.3 provides:

> **8.3 Personal and Slanderous Remarks:** Any person making personal, rude or slanderous remarks, or who becomes boisterous, while addressing the Council shall be requested to leave the meeting and may be at once barred by the presiding officer from further audience before the Council.

Absent a challenge to these Rules, the plaintiffs' First Amendment claims arguably "will only survive if the defendants went beyond the" scope of the Council's rules in their enforcement against the plaintiffs. *See Wysinger v. City of Benton Harbor,* 968 F.Supp. 349, 354 (W.D.Mich.1997); *Lamb's Chapel v. Center Moriches Union Free School Dist.,* 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352, 361–62 (1993) (Even if facially valid, a governmental directive may still violate a party's First Amendment rights if applied unconstitutionally). Though even ambiguous in this regard, the plaintiffs' brief indicates that the plaintiffs' claims rest principally with the defendant's enforcement or application of the Council's rules.[8] The plaintiff C.E. Scroggins argues that these rules were "not reasonable inasmuch as Mr. Scroggins was not given any opportunity to attempt to comply" with them before being removed from the podium and meeting. (Dk.28, p. 18). The other plaintiffs argue that they violated no Council rule and that the Council never

inquired whether their comments would violate any rule. Thus, the court will focus most of its analysis on whether the defendant's application of the rules against the plaintiffs exceeded the scope of the Council's rules.

As stated previously, it appears that the Council's Rule 8.3 prohibiting "personal, rude or slanderous remarks" is content-neutral. It is not based on Council's disagreement with any particular message. Its terms and purpose are unrelated to any particular viewpoint. Finally, it targets the secondary effect of such speech on the Council's meetings and does not target the expressive content of the speech itself. Nor has there been a showing that the Mayor applied the rule against the plaintiffs in a manner that was anything but content-neutral and viewpoint-neutral. Thus, the validity of the defendant's rule and actions depend upon them being narrowly tailored to serve a significant governmental interest and upon them leaving open ample alternative channels for communication.

Several courts, including the Supreme Court, have recognized the government's significant interest in conducting orderly, efficient, effective and dignified meetings of its public bodies. *See, e.g., City of Madison,* 429 U.S. at 175 n. 8, 97 S.Ct. 421; *Kindt v. Santa Monica Rent Control Bd.,* 67 F.3d at 271 (board has "legitimate interest in conducting efficient, orderly meetings."); *White v. City of Norwalk,* 900 F.2d at 1425 ("City Council meeting is still just that, a governmental process with a governmental purpose."); *Jones v. Heyman,* 888 F.2d at 1332–33 (City Commission has significant governmental interest "in conducting orderly, efficient meetings."); *Devine v. Village of Port Jefferson,* 849 F.Supp. 185, 190 (E.D.N.Y.1994) (village board has "a significant interest in conducting its meeting in an orderly and effective fashion."); *Godwin v. East Baton Rouge Parish School Bd.,* 408 So.2d 1214, 1218 (La. 1981) (school "board's interest in conducting its meetings in an orderly and dignified manner is a substantial consideration and a valid governmental objective."), *appeal dismissed,*

---

8. The plaintiffs' complaint does not include any claim seeking a declaratory judgment on the

constitutionality of the ordinance or the Council rules.

459 U.S. 807, 103 S.Ct. 31, 74 L.Ed.2d 45 (1982); *State v. Smith*, 46 N.J. 510, 517, 218 A.2d 147, 150 (sustained disorderly conduct convictions for disturbances during city council meeting. "Whether the forum be the courtroom or the chamber of the legislature itself or of a political subdivision of the State, there must be order. It is frivolous to suggest the First Amendment stands in the way of that imperative."), *cert. denied*, 385 U.S. 838, 87 S.Ct. 85, 17 L.Ed.2d 71 (1966). The Supreme Court in *City of Madison* recognized that public bodies obviously "may confine their meetings to specified subject matter." 429 U.S. at 175 n. 8, 97 S.Ct. 421. Justice Stewart in his concurrence added that public bodies have "broad authority to structure the discussion of matters that it chooses to open to the public." 429 U.S. at 180, 97 S.Ct. 421.

In *White*, the Ninth Circuit analyzed in some detail this significant governmental interest:

[A] City Council meeting is still just that, a governmental process with a governmental purpose. The Council has an agenda to be addressed and dealt with. Public forum or not, the usual first amendment antipathy to content-oriented control of speech cannot be imported into the Council chambers intact. In the first place, in dealing with agenda items, the Council does not violate the first amendment when it restricts public speakers to the subject at hand. *Madison School Dist.*, 429 U.S. at 175 n. 8, 97 S.Ct. 421; *see Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) (public forum may be created by government designating "place or channel of communication ... for the discussion of certain subjects"). While a speaker may not be stopped from speaking because the moderator disagrees with the viewpoint he is expressing, *see Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 60–61, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (Brennan, J., dissenting), it certainly may stop him if his speech becomes irrelevant or repetitious.

Similarly, the nature of a Council meeting means that a speaker can become "disruptive" in ways that would not meet the test of actual breach of the peace, (citation omitted), or of "fighting words" likely to provoke immediate combat. (citation omitted). A speaker may disrupt a Council meeting by speaking too long, by being unduly repetitious, or by extended discussion of irrelevancies. The meeting is disrupted because the Council is prevented from accomplishing its business in a reasonably efficient manner. Indeed, such conduct may interfere with the rights of other speakers.

900 F.2d at 1425–26. The reasoning of this case and the others cited above persuades this court that the Council's interest in conducting orderly, efficient, and dignified meetings and in preventing the disruption of those meetings is a significant governmental interest. All of these cases plainly recognize an important governmental interest in limiting comments to matters directly relevant to that governmental body's business. In addition, the rule against personal and slanderous remarks, like other rules of decorum, serves the important governmental interest of preventing disruptions to its meetings. The plaintiffs do not refute the defendant's position that emotionally charged personal attacks could antagonize and even incite others and that a rule restricting such attacks is both a rational and reasonable means for achieving the Council's interest in orderly, efficient, effective and dignified meetings.

Nor do plaintiffs raise any genuine issues of material fact on whether the defendant's application of these Council rules against them actually served a significant governmental interest. The plaintiffs do not dispute that the defendant reasonably believed that C.E. Scroggins had violated two Council rules when he made comments personally assailing the character of Cecil Washington. The comments concerned a topic that was not directly relevant to the business of the City Council and constituted personal, rude and potentially slanderous remarks. It necessarily follows that the important governmental interests behind the rules were served when the Mayor enforced them and terminated C.E. Scroggins' public comments.

Three of the plaintiffs argue they violated no Council rule and, therefore, no significant governmental interest could have been

served in barring their public comments. The plaintiffs submit no authority for the proposition that the Council must always wait until the speaker actually utters infringing words before it can enforce its rules. Such an approach seems unreasonable when the Council essentially knows what the speaker intends to say and the Council is enforcing restrictions based on relevancy and personal attacks. When a speaker discloses the topic of his comments in advance of the meeting, the Council should be able to rely on that disclosure in determining whether the speaker's comments will relate to a matter directly relevant to business of the Council. When there are other unique circumstances that also reveal the speaker's intent to persist with another speaker's personal attack on someone, the presiding officer at the meeting should have the leeway to make a reasonable judgment call without risking liability. *See Jones v. Heyman,* 888 F.2d at 1333–34.

The uncontroverted facts establish the following relevant circumstances. On June 14, 1994, C.E. Scroggins had informed the City Clerk's Office that he and the other plaintiffs would address the Council during its public comment period on Washington's appointment to the Mayor's Commission on Family Status. In advance of the Council meeting, Mayor Felker received a memorandum informing him that C.E. Scroggins, his wife, Verlene, and his two children, Sharifa and Sakar, were going to speak on this topic. None of the plaintiffs told the Mayor or the Council that they intended to speak on a subject other than Washington's appointment to the Mayor's Commission. From C.E. Scroggins' prior meeting with the Council Administrator, Mayor Felker knew that Scroggins and his family would be appearing at a Council meeting to reveal some highly personal information about Washington. Also before the Council meeting, C.E. Scroggins had sent the Mayor and all Council members a packet of documents which were intended to evidence the wrongs that Scroggins believed Washington had committed. Finally, both C.E. and Verlene Scroggins had spoken with Mayor Felker sometime well before the Council meeting about their personal concerns with Washington. From all the above circumstances, Mayor

Felker in his role as presiding officer of the Council meeting could reasonably infer that C.E. Scroggins' wife and children fully intended to address the Council concerning the appointment of Washington to the Mayor's Commission, a matter that was not directly relevant to Council business, and fully intended to continue the personal attack on Washington that their husband and father had initiated. Therefore, Mayor Felker's actions in terminating C.E. Scroggins' comments and in preventing the other plaintiffs' related comments served Council's significant governmental interests in limiting speakers to relevant topics and in preventing disruption of Council meetings. *See Jones v. Heyman,* 888 F.2d at 1333.

■ The plaintiffs also do not dispute that the Council's rules are narrowly tailored to achieve these significant governmental interests. To be narrowly tailored, the court need not find that the regulation was the least restrictive or least intrusive means for doing so. *Ward,* 491 U.S. at 798, 109 S.Ct. 2746. "Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Ward,* 491 U.S. at 799, 109 S.Ct. 2746 (quoting *United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)). The court believes that the Council rules at issue plainly promote a substantial government interest in orderly, efficient, and dignified meetings and that without these rules the Council's ability to conduct such meetings would be compromised. As stated before, the court also finds that the Mayor's judgment call under these circumstances was a reasonable attempt to confine speakers to a relevant topic and to avoid further personal attacks. As for the plaintiff's argument that the Mayor acted unreasonably in not giving C.E. Scroggins' a chance to comply with the rules before terminating his comments, the plaintiffs offer neither law nor evidence to sustain their argument. In fact, C.E. Scroggins knew of the Council's rules prior to the meeting and also knew that the Council Administrator considered his comments to be inappropriate personal matters. Moreover, the Mayor warned C.E. Scroggins that his comments were not

relevant and violated the Council rule forbidding personal attacks. When Scroggins failed to heed that warning, the Mayor then ended Scroggins' comment period. The court finds nothing unreasonable in the Mayor's judgment call under these circumstances.

As for the last requirement of ample alternative channels for communication, the plaintiffs again do not dispute that this element is met here. The defendant argues:

> Plaintiffs had already provided written communication to members of the City Council, and had contact with individual Council members, had spoken with the Mayor and his wife directly, had provided a large packet of information which addressed their collective concerns about the appointment of the local minister, and had conversed with "most if not all" of the members of the Topeka City Council. This was mere repetition of an oft repeated refrain, an echo of an already communicated, but zealously pressed, notion.

(Dk.23, p. 18). The plaintiffs offer no response to this argument. Consequently, the court finds that the defendant afforded ample alternative channels to the plaintiffs for communicating their personal concerns with the Mayor's appointment of Washington to the Commission on Families.

Based on all the above analysis, the court finds that the defendant is entitled to summary judgment on the plaintiffs' free speech claim.

## IV. RIGHT TO PETITION CLAIM

■ "The right to petition is cut from the same cloth as the other guarantees of that Amendment, and is an assurance of a particular freedom of expression." *McDonald v. Smith,* 472 U.S. 479, 482, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985). Though separate guarantees, the right to free speech and right to petition "are related and generally subject to the same constitutional analysis." *Wayte v. United States,* 470 U.S. 598, 610 n. 11, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985); *see Valot v. Southeast Local School District Bd. of Educ.,* 107 F.3d 1220, 1226 (6th Cir.) (a claim based on the right to petition "is subject to the same analysis applied to a claim arising under the Speech clause." (citations omitted)), *cert. denied,* —— U.S. ——, 118 S.Ct.

164, 139 L.Ed.2d 108 (1997); *Schalk v. Gallemore,* 906 F.2d 491, 498 (10th Cir.1990) (the analysis is not different because the "right to petition is inseparable from ... right to speak."). The plaintiffs concede this point and agree that the government has the same authority to regulate their right to petition as their right to speak. Having found that the defendant is entitled to summary judgment on the plaintiffs' free speech claim, the court concludes that those same grounds entitle the defendant to summary judgment on the plaintiffs' right to petition claim.

■ Moreover, the plaintiffs' right to petition does not include the right to speak personally with the Council or Mayor:

> The "right to petition government afforded by the First Amendment does not include the absolute right to speak in person to officials. Where written communications are considered by government officials, denial of a hearing does not infringe upon the right to petition. The right to petition government does not create in the government a corresponding duty to act."

*Cronin v. Town of Amesbury,* 895 F.Supp. 375, 390 (D.Mass.1995) (quoting *Stengel v. City of Columbus, Ohio,* 737 F.Supp. 1457, 1459 (S.D.Ohio 1988) (citations omitted), *aff'd,* 902 F.2d 35 (6th Cir.1990) (Table)), *aff'd,* 81 F.3d 257 (1st Cir.1996). The rationale behind this rule is unquestionably sound:

> We consider first plaintiff's claim that she was deprived of her right to petition the city government for redress of grievances. It is clear that plaintiff was not deprived of such right. As stated, supra, she was expressly told that any grievances or opinions should be presented in a written communication. And unquestionably, her letter of December 26, 1982 presented plaintiff's "grievances," and this "petition" was received and considered by defendants.
>
> What plaintiff was deprived of, at most, was simply the opportunity to *orally* address the City Council while it was in session. We are aware of no authority granting a citizen the constitutional right to vocalize an alleged grievance under the circumstances here present. On plaintiff's theory, the Constitution would authorize

every person to go upon the floor of either house of Congress or of a state legislature while it is in session and orally present such person's opinions on any matter. By the same token, any person would have the right to insist that such person be permitted to orally explain his or her views to the President or a member of his cabinet.

*See Green v. City of Moberly,* 576 F.Supp. 540, 542 (E.D.Mo.1983). The plaintiffs do not deny that they were able to exercise their right to petition in written communications with the Council. In fact, C.E. Scroggins testified that all of the plaintiffs' concerns with the appointment of Washington were contained in the written packet of documents distributed to Council members and the Mayor. The court grants the defendant's motion for summary judgment on this claim.

## V. EQUAL PROTECTION CLAIM

In opposing summary judgment on this claim, the plaintiffs concede that C.E. Scroggins does not have an equal protection claim against the defendant:

In considering this argument, Plaintiffs contend that Plaintiffs Verlene Scroggins, Sharifa Scroggins–Britt and Sakar Scroggins the specific Plaintiffs who were subjected to treatment which resulted in a violation of their right to equal protection.

Plaintiffs concur with the general analysis put forth by Defendant in its Brief: A Plaintiff must prove differential treatment from similarly situated individuals and that the differential treatment lacked a rational basis. (citations omitted).

Plaintiffs contend that Verlene, Sharifa and Sakar Scroggins were not treated in the same manner as other individuals who appear before the City Council to make public comment. Indeed, unlike any other individual, these Plaintiffs were prevented from speaking at all. The evidence on record presented by Defendant for consideration by the Court on its Motion for Summary Judgment demonstrates that Defendant has allowed other individuals to actually speak before "corrective" action was undertaken. In this instance, and only in this instance, were individuals utterly prevented from speaking at all.

(Dk.28, p. 21). As here explained, the plaintiffs' equal protection claim is based solely on

the Mayor's decision to enforce the Council's rules concerning relevancy and personal attacks against Verlene, Sharifa and Sakar without actually giving them the chance to say anything.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). "'Unless it provokes strict judicial scrutiny, a state practice that distinguishes among classes of people will typically survive an equal protection attack so long as the challenged classification is rationally related to a legitimate governmental purpose.'" *Riddle v. Mondragon,* 83 F.3d 1197, 1207 (10th Cir.1996) (quoting *Vasquez v. Cooper,* 862 F.2d 250, 251–52 (10th Cir.1988)). By concurring with the defendant's rational basis standard of review, the plaintiffs are conceding that the challenged classification here does not involve a suspect class or interfere with a fundamental right.

The defendant submits uncontroverted evidence that these same rules have been enforced against other speakers appearing at Council meetings. The plaintiffs argue this evidence alone shows they were treated differently, for unlike those other speakers, they were never allowed to say a word. The defendant insists those other speakers were not similarly situated based on a number of unique circumstances present here.

Rather than repeat the court's discussion and analysis of those circumstances involving these three plaintiffs, the court will distill them to the following uncontroverted factual conclusions. Based on prior disclosures and conversations, the Mayor knew even before C.E. Scroggins ever began speaking that the Scroggins' family's intention was to make a personal attack against Washington. The Mayor still allowed C.E. Scroggins to begin his comments, and when he started attacking Washington, the Mayor cautioned him about the Council rules. Only after C.E. Scroggins did not heed the warning, did the Mayor terminate those comments and bar Scrog-

gins' wife and children from taking up the family's personal attack on Washington. The wife and children never informed the Mayor before or during the meeting that their intentions were to speak on any topic other than what their husband and father would and did address.

The court finds that the plaintiffs have not come forth with any evidence that under similar unique circumstances the defendant enforced these rules differently. Nor do the plaintiffs demonstrate that the defendant acted irrationally or arbitrarily and without a legitimate governmental interest when it barred C.E. Scroggins' and his family from completing their personal attack on Washington.

IT IS THEREFORE ORDERED that the defendant City of Topeka's motion for summary judgment. (Dk.22) is granted.