**Rick D. BURNS, Plaintiff,**

v.

**The BOARD OF COMMISSIONERS OF the COUNTY OF JACKSON in the State of KANSAS, Edward D. Bruns, John T. Grau and Ellen Schirmer, Defendants.**

**No. 00–4119–SAC.**

United States District Court, D. Kansas.

March 8, 2002.

Deanne Watts Hay, Stanley R. Parker, Randy R. Debenham, Parker & Hay, LLP, N. Larry Bork, Goodell, Stratton, Edmonds & Palmer, Topeka, KS, for Plaintiff.

James S. Pigg, Donald Patterson, Fisher, Patterson, Sayler & Smith, Topeka, KS, for Defendants.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This employment termination case comes before the court on defendants' motion for summary judgment (Dk. 64), and the individual defendant's motions to dismiss official capacity claims (Dk. 27).

## SUMMARY JUDGMENT STANDARD

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265(1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas Drilling Partnership v. Federal Deposit Ins. Corp.,* 805 F.2d 342, 346 (10th Cir. 1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

Under this standard, this court examines the record to determine whether any genuine issue of material fact is in dispute, construing the factual record and reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Curtis v. Oklahoma City Pub. Schs. Bd. of Educ.,* 147 F.3d 1200, 1214 (10th Cir.1998). When the nonmovant will bear the burden of proof at trial, he can survive summary judgment only by going beyond the pleadings and presenting evidence sufficient to establish the existence, as a triable issue, of any essential and contested element of his case. *See McKnight v. Kimberly Clark Corp.,* 149 F.3d 1125, 1128 (10th Cir.1998).

## FACTS

1. Plaintiff applied for and received employment with the Jackson County Road Department on February 20, 1991. His job involved running a road grader. Immediately over his signature on the employment application was the following statement: "I understand and agree that my employment is for no definite period and may ... be terminated at any time without any previous notice." Plaintiff read this section of the application.

2. Neither the road supervisor nor the county commission as a whole discussed the length of plaintiff's employment with him or made any promises to him during the employment interview.

3. At the time of employment, plaintiff received no employment manual. Later, he received a policy manual which contained the following statement on page 1:

"THIS POLICY MANUAL DOES NOT CONSTITUTE A CONTRACT"

Kansas is an "at-will employment state and employment with Jackson County will be considered at-will unless a legal contract is established. At-will employment is when the employee serves totally at the pleasure of the employer and may be terminated with or without cause at any time."

4. Plaintiff read the section that said that the policy manual did not constitute a contract and the paragraph under that heading.

5. The policy manual was withdrawn in February, 1999, and no other manual was adopted.

6. Plaintiff never signed a contract with the county. The county commission never voted to continue plaintiffs employment absent good cause to terminate him.

7. Plaintiff has never been told by any supervisor that he could retain his job absent good cause to terminate him.

8. Road Supervisor Bruns wrote employees on November 30, 1999, referring to a February 5, 1996 policy and reminding employees of the time they were required to be at the job site and that travel time between home and the job site was not compensated.

9. Thereafter employee Dan Smith arranged a meeting with county counselor Ed Dunn. On December 3, 1999, Smith, plaintiff, Dave Hegeman and Charlie Myers met with Dunn.

10. The main concern expressed at the meeting was whether employees were covered by workers compensation insurance and who would be responsible for any accident on the way to the work site.

11. During the meeting Dunn was cordial and never appeared agitated or angry.

12. After the meeting Dunn asked Kansas Workers Compensation officials about the workers compensation issue, but made no inquiry of state or federal officials about wage and hour issues because he had not been asked to do so by the employees.

13. Plaintiff recalls no specific comments he made during the December 3rd meeting. Dunn recalls that plaintiff's only comment was: "you cant teach the dumb son of a bitches anything," referring to the county commissioners.

14. In late December of 1999, a new pay plan was issued effective January 1, 2000, placing employees in a "B" or "A" category. Under that plan, plaintiff's pay raise was neither minuscule nor large, but was in the mid-range. County Commissioner Ogden believed that supervisor Bruns had showed favoritism and had punished employees who met with county counselor Dunn by ranking them as B's rather than A's.

15. On January 24, 2000, Jackson County Commissioner John Grau stopped at plaintiff's residence to talk with plaintiff at plaintiff's request.

16. Plaintiff asked Grau why the county traded the bulldozer for a Caterpillar without first trying the Caterpillar out. Grau replied that he thought the county needed a new dozer.

17. Plaintiff next asked about the county's purchase of a pickup. The county had a Ford pickup that supervisor Bruns drove that had been traded, supposedly because it was worn out. Plaintiff said that he and

other employees thought it ironic that the bridge foreman who often had ridden in the truck had purchased it from the dealer. Grau responded that it was "all legal." The pickup was only briefly discussed.

18. Next, plaintiff inquired who had developed the pay scale placing employees in two separate categories. Grau replied that plaintiff could "blame it on me." Plaintiff argued that Grau had not answered his question. Grau responded: "We all made it." Plaintiff then called Grau a "lying motherfucker." [1] They were about three feet away from each other at the time.

19. Plaintiff claims that Grau then charged at him and called him a "no good Indian," so plaintiff put his hand out to stop him, contacting Graus chest.

20. The conversation continued with plaintiff repeating his assertion that the pay plan was not fair in that some new employees were making more money than more senior employees. Grau responded by stating that was the way supervisor Bruns had wanted it.

21. The remaining conversation related to doing chores and ended amicably.

22. Grau did not approach plaintiff, become irritated or seem mad at any time during the conversation except immediately after plaintiff called him a profane epithet. Otherwise, the conversation was businesslike. Grau did not respond in a negative manner to either the comments about the dozer or the purchase of the pickup.

23. Plaintiff admits that it was important for the county road supervisor to have a reliable four-wheel drive pickup to get around in bad conditions. Plaintiff had little information about the pickup trade. He did not know how much the county received when the pickup was sold or traded, how much the foreman paid the dealer when he purchased the pickup, or how many miles were on the old pickup. He had no judgment as to its value at the time of trade. He had no information to suggest that the foreman bought the pickup for a reduced price. His only basis for suggesting that any kind of misdealing occurred was the fact that the foreman was familiar with the truck and he questioned why the foreman would want to buy it if it were so worn out that the county wanted to trade it and buy another one.

24. Bruns and the shop foreman had recommended trading the bulldozer because of mechanical difficulties with the old dozer and concern that expensive repair work would need to be done. The dealership had been unable to fix the problem. Additionally, the governmental discount from the dealership was expected to be reduced if the purchase were delayed until the next year.

25. George Uhl, who was present during plaintiff's conversation with commissioner Grau on January 24, 2000, and who operated the dozer, also questioned the purchase of the new Caterpillar. Uhl complained to Grau on another occasion that he didn't like the new dozer compared to the old dozer, and that it was not as powerful as the old. Uhl had also previously complained to Ed Bruns about the wage plan. Uhl had also had a letter published in the Holton newspaper complaining about equipment purchases.

26. Grau perceived Uhl to be very vocal on the bulldozer issue, "very worked up" about that. Uhl also participated in the discussion of the pay plan and truck purchase on the 24th, taking substantially the same position as did plaintiff. Al-

---

1. This vulgar name will be referred to hereinafter solely as a "profane epithet," or "fight- ing words."

though their conversation was not cordial, Uhl never touched Grau. Although Uhl may have sworn some, he never directed any curse words at Grau or called him a profane epithet, as plaintiff did.

27. Following the confrontation between plaintiff and Grau on January 24, 2000, Grau reported the incident to Bruns, informing Bruns that he had stopped at plaintiff's place at plaintiff's request, that plaintiff was upset with the pay plan and equipment purchases, that plaintiff called him a profane epithet[2], that plaintiff grabbed him close to the neck, and that Grau put his hand up to stop him.

28. On January 28, 2000, supervisor Bruns, commissioner Grau and bridge foreman Terry Mick met with county counselor Ed Dunn. During the meeting, Grau discussed the confrontation on January 24, 2000, relating that he had stopped by plaintiff's place, that as he was getting out of his car plaintiff said "I didn't think the son of a bitch would have the balls to stop here," that they started talking about various things including a bulldozer, some used equipment, and the county pay plan. Grau stated that all of a sudden, plaintiff reached out and grabbed Grau by the throat and called him the profane epithet, said "I'm going to hit you," that Grau placed his arm on his chest to stop him, that they talked a little longer, then things settled down and Grau left.

29. Grau also informed Bruns that employee George Uhl was present during the encounter with plaintiff on January 24 and that Uhl had also talked to him about the same concerns that plaintiff had raised.

30. Ed Bruns had absolute authority to fire employees in the road and bridge department.

31. Ed Bruns never indicated that he was irritated that anybody had complained about trading a pickup truck, the purchase of a bulldozer or the pay plan.

32. The employees' dissatisfaction with the pay plan was that all employees in the same position were to receive the same pay regardless of their seniority.

33. The county added longevity pay to the pay plan the following year, or at least the employees learned of the longevity pay the following year.

34. Supervisor Bruns stated that he terminated plaintiff because of his altercation with Grau for "cussing, calling people names and grabbing them." He relied solely on Grau's version of who had grabbed whom. The decision was entirely Bruns' and was made later on January 28, 2000, after he had met with Grau and county counselor Ed Dunn.

35. Plaintiff received a letter from supervisor Bruns dated January 28, 2000, which stated:

The actions that you were involved in with Jackson County Commissioner John Grau on January 24, 2000 near your home, were of such a serious nature as to result in the immediate termination of your employment with the Jackson County Road and Bridge Department.

Such actions as reported to me would constitute gross misconduct, the threatening or committing of physical violence against the person of John Grau, and other violations of your employment.

I want to advise you that you may have a hearing before the Board of County Commissioners concerning this termination of your employment. If you desire a hearing, please request one within ten (10) days upon the receipt of this letter by-calling the Jackson County Clerks office.

2. Grau informed Bruns of the profane name plaintiff called him.

36. Plaintiff participated in a post-termination hearing. Commission Chair Grau turned his chair to Commissioner Schirmer, but still took an active part in the hearing and was one of the two votes to terminate plaintiff's employment.

37. Plaintiff had previously been counseled about his use of disrespectful language toward road department supervisors. When plaintiff was counseled about disrespectful language toward Supervisor Roy Halleron, plaintiff had replied that Halleron was not his foreman, stating something to the effect of "f* * * the little son of a bitch."

38. Plaintiff never talked to Ed Bruns about the reasons for Bruns recommendation to buy the Caterpillar or trade in the Ford pickup.

39. Plaintiff is one quarter Native American.

40. Plaintiff has never heard Ed Bruns use any terms derogatory of Native Americans.

41. Plaintiff has never heard Commissioner Grau or Commissioner Schirmer use any terms derogatory of Native Americans other than his claim that Commissioner Grau called him a "no good Indian" after plaintiff called Grau the profane epithet. Plaintiff was taught by Schirmer while in school and never observed any indication of bias against Native Americans. She never did or said anything to cause him to believe that she held his Native American heritage against him.

42. Plaintiff testified as follows at Vol. II of his deposition, p. 17, l. 3–p. 18, l. 4:

Q. Tell me each reason that you believe your being terminated was because you have some Native American blood.

A. Repeat the question again, please.

Q: Certainly. What I'm wondering is what are the reasons that cause you to believe that your termination had anything to [do] with the fact that you have a quarter, as I understand it, Native American blood.

A. I don't really know that there are, but I just don't think those were very good comments to be making.

Q. Do you think you were terminated because you're part Native American?

A. *No.*

Q. Why do you think you were terminated?

A. That's the question I never really ever get answered?

Q. What's your own opinion, though? Why do you believe you were terminated? Do you think it was because you called Grau a [profane name]?

A. *Yeah, I'd say so.*

(emphasis added). In his deposition corrections, plaintiff changed the answers which are italicized above to read, respectively: "No, I don't think that was the only reason," and "Yeah, I'd say that was part of it."

## ANALYSIS

### I. 1983 Property Interest

■ Plaintiff's first § 1983 claim alleges that defendants violated his right to procedural due process with respect to his property interest in continued employment with the county. The requirements of procedural due process apply only to deprivation of interests encompassed by the Constitution's protection of liberty and property. *See Bunger v. Univ. of Okla. Bd. of Regents,* 95 F.3d 987, 990 (10th Cir. 1996). Defendants allege that plaintiff had no property interest in his employment.

### Property Interests in General

■ To prevail on a claim under § 42 U.S.C.1983, a plaintiff " 'must allege both the deprivation of a federal right and that the alleged action was taken under color of state law.' " *Southern Disposal, Inc. v.*

*Texas Waste Management*, 161 F.3d 1259, 1265 (10th Cir.1998). The Fourteenth Amendment proscribes a state from depriving a party of "property without due process of law." U.S. Const. amend. XIV. To state a claim for a procedural due process violation, a plaintiff must allege the state denied him of a definite liberty or property interest without affording him fair procedures.

*Southern Disposal, Inc. v. Texas Waste Management*, 161 F.3d 1259, 1265 (10th Cir.1998).

■ The Supreme Court has defined a constitutionally protected property interest as a "legitimate claim of entitlement" to some benefit. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). A property interest is more than "an abstract need or desire," or a "unilateral expectation." *Id.* It is "an individual entitlement grounded in state law, which cannot be removed except for cause." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). "Due Process is not an end in itself. Rather, the constitutional purpose of Due Process 'is to protect a substantive interest to which ... [a party] has a legitimate claim of entitlement.'" *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir.2000) (quoting *Olim v. Wakinekona*, 461 U.S. 238, 250, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983)).

■ Property interests are not created by the Constitution, but are created and defined by rights under state law that support claims of entitlement to those benefits. *Roth*, 408 U.S. at 577, 92 S.Ct. 2701. Property interests may stem from state statutes, local ordinances, existing rules, contractual provisions or mutually explicit understandings. *Id.; Perry v. Sinder-*

*mann*, 408 U.S. 593, 602, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). The existence of a property interest is a question of law. *See Tarabishi v. McAlester Regional Hosp.*, 827 F.2d 648, 651 (10th Cir.1987).

**Analysis**

■ Plaintiff first contends that statements in the policy manual he was given created a property interest in employment with the county. Specifically, plaintiff relies upon the manual's existence of grievance and disciplinary procedures, and the requirement that employees give at least ten working days' notice before resigning.

■ The court disagrees. Procedural guarantees in a policy manual[3] cannot create a property interest, as the Tenth Circuit has recently held:

> Procedural guarantees in a handbook cannot create a property interest to which due process requirements apply. *See Bunger*, 95 F.3d at 991 (" 'Property' cannot be defined by the procedures provided for its deprivation.... The university's promise that it would follow certain procedural steps in considering the professors' reappointment did not beget a property interest in reappointment.") (quotation omitted).

*Isham v. Wilcox*, 2001 WL 505235, 10 Fed. Appx. 729 (10th Cir.2001). Plaintiff fails to show how the existence of the disciplinary or grievance procedures in the policy manual or the requirement of notice before quitting equates to a binding representation that plaintiff will not be terminated absent good cause.

■ Plaintiff next contends that a property interest was created by an implied contract, arising out of customs, practices and *de facto* policies, citing *Perry*

**3.** The court also finds it significant that the policy manual was not in effect at the time plaintiff was first hired by the county.

**1288**

*v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Specifically, plaintiff alleges that the county has a custom and practice of not firing employees who had used vulgar language. Plaintiff bases this assertion upon deposition testimony from two employees who stated that they had used foul language to their supervisors. (*See* Myers depo. p. 22–24; Uhl depo. p. 72–73.)

Plaintiff fails to show that the county's treatment of these employees is sufficient to constitute a custom or practice. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion) (custom requires that the illegal practice be "widespread"— *i.e.,* involving a "series of decisions"); *Randle v. City of Aurora,* 69 F.3d 441, 447 (10th Cir.1995). No showing has been made that the events involving two other employees occurred frequently enough to constitute a custom or practice, that those events were similar in kind or in degree to the event of January 24th, that the acts of such employees were ever reported to those with the authority to fire them, or that the county otherwise created any mutually explicit understanding between it and its employees by its non-termination of the two employees. Thus plaintiff has failed to show a material question of fact regarding any custom or practice of not terminating employees who use vulgar language.

 The same is true for plaintiff's claim that under Kansas law, he is entitled to a property interest in his job by virtue of an implied contract. The court is well aware of the employee-at-will rule and the various exceptions thereto under Kansas law. *See Brown v. United Methodist Homes for the Aged,* 249 Kan. 124, 815 P.2d 72 (1991); *Morriss v. Coleman Co., Inc.,* 241 Kan. 501, 738 P.2d 841 (1987); *Allegri v. Providence–St. Margaret Health Center,* 9 Kan.App.2d 659, 684 P.2d 1031

(1984). The court additionally understands that a property interest in employment for purposes of § 1983 may be created by an implied contract. *See Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Yearous v. Niobrara County Memorial Hosp.,* 128 F.3d 1351, 1355 (10th Cir.), *cert. denied,* 523 U.S. 1074, 118 S.Ct. 1515, 140 L.Ed.2d 669 (1998).

Nonetheless, the factors to which plaintiff points in support of his claim of an implied contract of perpetual employment are insufficient under the circumstances to raise a material question of fact on this issue. Plaintiff's claim is that an implied contract of employment not to fire absent good cause was created by the following: the employee handbook; his favorable evaluation ratings and normal salary increases; the "policy" of not firing employees who used vulgar language; and county counselor Dunn's express assurance that there would be no retaliation against those who expressed their concerns. (Dk. 69, p. 19.)

In the analysis above, this court rejected plaintiff's assertions regarding the policy manual and the alleged policy not to terminate employees who use vulgar language. Plaintiff's assertions regarding his favorable evaluation ratings and normal salary increases fare no better, as such factors are insufficient to create a genuine issue of material fact. *See e.g., Dickens v. Snodgrass, Dunlap & Co.,* 255 Kan. 164, 174, 872 P.2d 252 (1994) (finding no implied contract for continuing employment despite increases in pay and responsibilities and absence of negative evaluations); *Kastner v. Blue Cross and Blue Shield of Kansas, Inc.,* 21 Kan.App.2d 16, 27, 894 P.2d 909 (1995) (rejecting contention that a performance evaluation was probative of whether an implied-in-fact contract of employment existed between the parties be-

cause it did not suggest that plaintiff could be terminated only for good cause).

This leaves solely county counselor Dunn's assurance that there would be no retaliation against those who expressed their concerns. Dunn's statement is nothing but an attorney's assurance that the county would follow the law. Plaintiff fails to explain how such an assurance somehow translates into a promise that plaintiff could be terminated only for good cause.

Here, the employee-at-will statement in plaintiff's employment application, followed by the disclaimer in the policy manual, makes it clear that the county did not intend to form a contract with plaintiff that he could not be terminated absent good cause. Furthermore, there is no evidence suggesting a contrary intent. Thus, plaintiff has failed to come forward with evidence to establish a material issue of fact regarding the intent of the parties to form an implied-in-fact contract of employment. *See Plummer v. Humana of Kansas, Inc.,* 715 F.Supp. 302, 304 (D.Kan.1988). Accordingly, plaintiff's claim of implied contract fails.[4] Because plaintiff has not shown that he may have a legally protected property interest in his employment, summary judgment on this claim is warranted.

## II. Section 1983 Equal Protection Claim

Defendants seek summary judgment on plaintiff's claim, brought pursuant to § 1983, that defendants violated the equal protection clause by terminating his employment due to a racially discriminatory motive. A plaintiff can show intentional discrimination either by direct evidence of discrimination or by indirect evidence, employing the burden-shifting framework first articulated *McDonnell Douglas Corp.*

*v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiff attempts to show both direct and indirect evidence, which the court examines below.

*Direct Evidence*

■ Plaintiff argues that three statements allegedly made by commissioners Grau and Schirmer constitute direct evidence of racial discrimination. These consist of Grau's statement to plaintiff, in response to his fighting words on January 24th, that plaintiff was a "no good Indian," Schirmer's statement to someone other than plaintiff that people in the district must not care very much about the county because the only persons they could get to run for office were Indians, and Schirmer's comment to someone other than plaintiff about those "damn Indians."

■ These statements, even if assumed to be uncontroverted, admissible, and considered in the light most favorable to plaintiff, fail to constitute direct evidence. "Direct evidence is that which does not require an inference to prove discrimination, such as oral or written statements by an employer showing a discriminatory motive." *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1225 (10th Cir. 2000). In this case, plaintiff has not demonstrated the significance of non-contemporaneous statements to the ultimate decision to terminate him. "Statements by decisionmakers unrelated to the decisional process itself'" will not suffice. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 248–50, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Because plaintiff has failed to demonstrate a causal nexus between the comments and his discharge, such comments are nothing more than expressions of personal opinion and do not constitute direct evidence of a

---

**4.** The court finds it unnecessary to reach the issue whether a county lacks power to enter

in to an implied contract with an employee.

racially-motivated discharge. *See Shorter v. ICG Holdings, Inc.,* 188 F.3d 1204, 1207–08 (10th Cir.1999). Plaintiff must therefore show indirect evidence of such.

*Indirect Evidence*

■ A plaintiff who lacks direct evidence of racial discrimination may rely on indirect evidence of discrimination by invoking the analysis articulated in *McDonnell Douglas.* *See McDonnell Douglas,* 411 U.S. at 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668. Although *McDonnell Douglas* involved a Title VII claim, its analytical framework applies as well to § 1981 claims. *See Thomas v. Denny's, Inc.,* 111 F.3d 1506, 1509 (10th Cir.1997).

A plaintiff relying on *McDonnell Douglas* bears the initial burden of establishing a prima facie case by a preponderance of the evidence. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). This is commonly done in wrongful termination cases by showing that: (1) plaintiff belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge. *See Lowe v. Angelo's Italian Foods, Inc.,* 87 F.3d 1170, 1174–75 (10th Cir.1996).

If the plaintiff establishes a prima facie case, a rebuttable presumption arises that the defendant unlawfully discriminated against him. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The defendant must then articulate through some proof a legitimate, nondiscriminatory reason for the adverse employment action suffered by the plaintiff. *E.E.O.C. v. Flasher Co., Inc.,* 986 F.2d 1312, 1316 (10th Cir.1992); *see McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If the

defendant is able to show a valid reason, the plaintiff can avoid summary judgment only if he is able to show that a genuine dispute of material fact exists as to whether the defendant's articulated reason is pretextual. *See Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir.1995).

■ Defendants do not dispute that plaintiff states a prima facie case, and counter with an asserted legitimate reason for terminating plaintiff. Defendants assert that plaintiff was terminated because of his "verbal assault and physical battery of commissioner John Grau." (Dk. 65, p. 32).[5] Defendant has met its burden to produce some evidence to support this nondiscriminatory explanation for its decision. Defendant shows the court testimony from supervisor Bruns that he terminated plaintiff for "his altercation with Grau." (Dk. 65, Bruns depo., p. 13–14.) Although Bruns' gave no more specific response to the question, Bruns noted that although he did not need good cause to terminate employees, he considered insubordination, physical contact, and swearing and cursing at a supervisor as providing just cause for termination. (Dk. 65, Bruns depo. p. 13.)

The burden thus shifts to plaintiff to show pretext. Plaintiff contends that Bruns' reason is pretextual. A plaintiff may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *See, e.g., Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (1999) (quoting *Morgan v. Hilti, Inc.,* 108

---

**5.** Defendants elsewhere refer to their "legitimate, non-retaliatory reason for plaintiff's termination" as "his disorderly conduct," (Dk. 65, p. 23.), as "verbal disorderly conduct and a physical battery," (*Id.,* p. 27.) and as "verbal and physical misconduct." (*Id.* p. 28.)

F.3d 1319, 1323 (10th Cir.1997)). Mere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment. *Id.* (citing *Morgan,* 108 F.3d at 1323).

Plaintiff's evidence of pretext consists solely of the comments attributed to Grau and Schirmer, which the court found insufficient to constitute direct evidence. The court disregards the "Damn Indians" comment attributed to Schirmer, because it is clearly hearsay in nature. *See* Dk. 69, Burns depo., p. 13. The other comment attributed to Schirmer, as related by Ogden, the person who heard it, is that Schirmer said "there are two Native Americans running in the third district, so the third district must not really care." Dk. 69, Ogden depo., p. 10. From this statement, plaintiff asserts that Schirmer meant that people didn't care very much about the county because the only two candidates for county office were Native Americans.

The question asked to Ogden, however, does not support that conclusion. The question related solely to the fact that Ogden served on both the county commission and the tribal counsel, a practice of which Schirmer apparently disapproved. The question asked to Odgen was:

> "Exactly what did John Grau and Ellen Schirmer say to you that made you reach the conclusion that they thought you should not both be a county commissioner and a tribal counsil (sic) member?" Dk. 69, Ogden depo. p. 10. Ogden then responded that Schirmer said: "there are two Native Americans running in the third district, so the third district must not really care." Dk. 69, Ogden depo., p. 10.

Taken in context, Schirmer's statement cannot reasonably be construed to be racially derogatory, but merely explained that although she did not believe Ogden should serve at the same time on both the

county commission and the tribal commission, the people in the district did not seem to care about that issue.

This leaves solely Grau's calling plaintiff a "no good Indian," in immediate response to plaintiff's fighting words hurled toward Grau. Plaintiff is thus required to demonstrate a nexus exists between the allegedly discriminatory statements and the decision to terminate him. *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 531 (10th Cir.1994).

Although Grau reported the altercation to Bruns, it was Bruns, and not Grau, who had the plenary authority to hire and fire employees in his department, including the plaintiff. No evidence shows the court that Bruns was aware that plaintiff was of Native American ancestry at the time he decided to terminate plaintiff. Nor has any evidence been introduced that Bruns had ever made race-based statements or otherwise demonstrated that he harbored an attitude of discrimination against Native Americans. Bruns' decision to terminate plaintiff has not been shown to have any relation whatsoever to the fact that plaintiff is Native American.

Grau, as a commissioner, participated in plaintiff's post-termination hearing, chaired by defendant Schirmer. The minutes reflect that at the conclusion of the hearing, another commissioner moved to not terminate plaintiff, but that motion died for lack of a second. Grau then moved to terminate plaintiff, and defendant Schirmer seconded the motion. (Dk. 69, Exh. 2.) Plaintiff asserts, without support in the record, that plaintiff would not have been terminated absent Grau's participation because the vote would have been 1 to 1. Defendants assert, also without citation to the record, that plaintiff would have been terminated if the vote were 1 to 1, because two votes were needed to overturn Bruns decision to terminate plaintiff. Plaintiff has failed to show that

he would not have been terminated had Grau not participated in the post-termination hearing, thus even if Grau harbored discriminatory animus toward plaintiff on the date of his termination, no causal connection has been shown between the two. Plaintiff has failed to come forward with sufficient evidence that his race was a determinative factor in the commission's decision.

Grau did report his altercation with plaintiff to supervisor Bruns who, without any independent investigation, relied upon that information in deciding to terminate plaintiff. Although Grau may have reported some erroneous facts to Bruns, the falsity of some information relied upon by Bruns is immaterial absent an allegation that Bruns did not believe the information, or act in good faith upon that belief. *See Jacobs v. Delta Air Lines, Inc.,* 1998 WL 514620, at *3, 156 F.3d 1243 (10th Cir. 1998) (Table). Plaintiff has failed to assert any facts tending to establish that Bruns did not actually believe Grau's allegations about plaintiff, but instead used those allegations as a pretext for an otherwise discriminatory termination. *See Merkel v. Leavenworth County Emergency Medical Services,* 2000 WL 127266, *8 (D.Kan. Jan. 4, 2000).

▮ Additionally, the court cannot ignore plaintiff's concession during his deposition that he believed he was terminated for his use of fighting words, showing that at the time of his deposition, plaintiff did not believe defendants' stated reason was pretextual. During his deposition, plaintiff stated his belief that he was in fact terminated for calling Grau the profane epithet. Plaintiff then attempted to substantially change the substance of his testimony via his errata sheet. Plaintiff testified in his deposition that he did not think he was terminated because he is part Native American, and that he believed he was terminated because he called Grau the profane epithet. In his errata sheet, plaintiff changed these responses by stating that his being Native American was not the only reason for his termination, and that his name calling was part of the reason for his termination.

Plaintiff has clearly attempted to change his deposition to give more artful answers in his errata sheet which present clear, irreconcilable conflicts with those he originally gave. Plaintiff's original answers demonstrated no confusion about the questions he was being asked. Further, those questions were ones on which his attorney could have cross-examined him at the time, and his changes to those crucial answers do not purport to be based upon newly discovered evidence. Under these circumstances, the court will disregard plaintiff's attempt to rewrite portions of his deposition. *See Erasmus v. Wal–Mart Stores, Inc.,* 2002 WL 12261, 24 Fed.Appx. 979, 981–83 (10th Cir.2002) (Table); *Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir. 1986) (regarding conflicting affidavits); *Zhu v. Countrywide Realty, Co., Inc.,* 165 F.Supp.2d 1181, 1195 n. 13 (D.Kan.2001) (regarding deposition changes); *Rios v. Welch,* 856 F.Supp. 1499, 1502 (D.Kan. 1994) (same).

Plaintiff has failed to "present enough evidence to support an inference that the employer's reason was merely pretext, by showing either 'that a discriminatory reason more likely motivated the employer or ... that the employer's proffered explanation is unworthy of credence.'" *Cone,* 14 F.3d at 530 (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Summary judgment on plaintiff's § 1983 equal protection claim is thus warranted.

## III. Section 1983 First Amendment Claim

▮ Plaintiff additionally brings a § 1983 claim alleging a violation of his

First Amendment right to free speech. Plaintiff alleges that he engaged in protected speech on January 24th, 2000, and that defendants retaliated against him because of that speech. Defendants claim that none of plaintiff's speech on January 24th was protected, and that plaintiff was terminated based upon his use of fighting words. This case could thus present the unusual situation in which the plaintiff engaged in both fighting words and in protected speech in the course of one event which both parties concede formed the basis for plaintiff's termination.

**General Law**

■ It is well established that a government employer "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Lytle v. City of Haysville, Kansas,* 138 F.3d 857, 863 (10th Cir.1998) (quotation marks and citation omitted).

■ "It is clear that 'fighting words'—those that provoke immediate violence—are not protected by the First Amendment." *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 927, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982); *Cannon v. City and County of Denver,* 998 F.2d 867, 872 (10th Cir.1993). The Tenth Circuit defines "fighting words" as "epithets (1) directed at the person of the hearer, (2) inherently likely to cause a violent reaction, and (3) playing no role in the expression of ideas." *Cannon,* 998 F.2d at 873.

The court has no doubt that the profane epithet plaintiff used toward Grau consisted of fighting words, unprotected by the First Amendment. However, the rest of plaintiff's statements, and those for which plaintiff alleges he was terminated, are not fighting words.

The Tenth Circuit recently reviewed the framework for determining whether speech is protected under law, in stating:

*Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and its progeny set forth the applicable framework for determining the First Amendment rights of public employees ... *See Moore v. City of Wynnewood,* 57 F.3d 924, 931 (10th Cir. 1995). Under this framework, we must first decide whether the employee's speech may be "fairly characterized as constituting speech on a matter of public concern." *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). We determine this "by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708. If the speech addressed a matter of public concern, we must next balance the employee's "interest in making [his] statement against 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through it employees.'" *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (quoting *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731, 20 L.Ed.2d 811). These two steps in the inquiry present legal issues to be resolved by the court. *See Gardetto v. Mason,* 100 F.3d 803, 811 (10th Cir.1996).

*Prager v. LaFaver,* 180 F.3d 1185, 1190 (10th Cir.1999).

■ The court first addresses whether plaintiff's speech touches upon matters of public concern. "Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of [public] officials, in terms of content, clearly concerns matter of public import." *Conaway v. Smith,* 853 F.2d 789, 796 (10th Cir.1988); *see also Considine v. Board of County Comm'rs,* 910 F.2d 695, 700 (10th Cir.1990) (discussing Tenth Circuit cases in which whistle blowing activity was held to touch

on matters of public concern). The Tenth Circuit has defined matters of public concern as "those of interest to the community, whether for social, political, or other reasons." *Lytle*, 138 F.3d at 863. The court is to discern "whether the speech was calculated to disclose misconduct or dealt with only personal disputes and grievances with no relevance to the public interests." *Conaway*, 853 F.2d at 796.

 If plaintiff's speech were merely a comment on his personal employee dispute, it would be unprotected by the First Amendment. *See Connick*, 461 U.S. at 148, 103 S.Ct. 1684 (speech was merely extension of an internal employee dispute); *David v. City and County of Denver*, 101 F.3d 1344, 1355 (10th Cir.1996) ("[S]peech relating to internal personnel disputes and working conditions ordinarily will not be viewed as addressing matters of public concern."); *Hom v. Squire*, 81 F.3d 969 (10th Cir.1996) (public employee's speech regarding his grievances which sought leave time and which challenged supervisor's letter of reprimand did not involve matter of public concern, but involved only matters of internal departmental affairs and personal interest, so was not protected by First Amendment); *but see Starrett v. Wadley*, 876 F.2d 808 (10th Cir.1989)(female employee's complaints about male supervisor's alcohol problems were matters of public concern where she testified that her motive in speaking out was not purely personal but stemmed from her concerns as member of community.)

 Although plaintiff's speech was not made in a public forum, this fact is not fatal to plaintiff's claim. Plaintiff's choice to speak through a private forum, rather than a public one, does not remove the speech from First Amendment protection. *See Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 415–16, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) (holding First Amendment protection applies when

a public employee arranges to communicate privately with employer rather than express his view publicly); *Conaway*, 853 F.2d at 797 (employee's complaints made privately to City Administrator still held to be a matter of public concern).

 The court is to "focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose. (citation omitted)." *Woodward v. City of Worland*, 977 F.2d 1392, 1403 (10th Cir.1992). However, to be protected, speech must do more than just generally relate to a matter of public interest; it must also be sufficiently informative to be useful to the public in evaluating government conduct. *See Moore v. City of Wynnewood*, 57 F.3d 924, 932 (10th Cir.1995); *Wilson v. City of Littleton, Colorado*, 732 F.2d 765, 768 (10th Cir.1984). Thus, "[i]n order for a public employee's speech to be of public concern, ... it is not always enough that its subject matter could in [certain] circumstances, [be] the topic of a communication to the public that might be of general interest. What is actually said on that topic must itself be of public concern." *Koch v. City of Hutchinson*, 847 F.2d 1436, 1445 (10th Cir.1988) (en banc) (quotation and citations omitted).

### Analysis

Defendants assert that plaintiff's motivation was purely personal, in that he primarily wanted to know who was responsible for making the wage scale which directly affected him. Defendants further assert that plaintiff's complaints about the pickup and dozer purchases were related to the pay scale issue because plaintiff did not believe the county should be purchasing new equipment when the pay scale was where it was. Plaintiff alleges that his motivation was

public, as his comments expressed his concern that Bruns was wasting taxpayer dollars, was demonstrating favoritism, and was not properly disposing of county property.

■ The court finds that plaintiff's speech regarding the pickup, the bulldozer, and the pay plan were not sufficiently informative to be useful to the public in evaluating government conduct. Although the topics of improper disposal of county property, favoritism in pay scales, or wasting taxpayer dollars could theoretically address matters of public concern, what plaintiff actually said on those topics were not of sufficient public concern.

*Compare Moore v. City of Wynnewood,* 57 F.3d 924 (10th Cir.1995) (finding police officer's statements at a city council meeting regarding the role of an "image problem" of an officer in causing or exacerbating a riotlike incident were of sufficient public concern, although they additionally related to a general grievance he had with his superior.); *Wulf v. City of Wichita,* 883 F.2d 842, 857–59 (10th Cir.1989) (finding a letter written by a police officer to the state attorney general complaining about a police chief's interference with the activities of a police union were of public concern, even though the letter also related to personal problems and tension between the officer and police chief).

■ But even had the court found that plaintiff's speech were protected, and that plaintiff's interest in speaking outweighed the county's interest,[6] the record contains insufficient evidence that plaintiff's protected speech "was a substantial or motivating factor in the termination," *Bd. of County Comm'rs, Wabaunsee Coun-*

ty, *Kan. v. Umbehr,* 518 U.S. 668, 675, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996). Instead, the record shows that Grau showed no indication of being upset with plaintiff or his speech on January 24, 2000, while they discussed the bulldozer and pick-up issues. It was not until the moment plaintiff engaged in the use of fighting words that Grau became upset.

The record additionally shows that Uhl, another employee in the same department as plaintiff, had criticized the pay plan or the equipment purchases not only to Bruns and Grau but also publicly in a letter to the newspaper, but was not terminated. The county's retention of Uhl, who was more vocal publicly about these issues than was the plaintiff, cuts against plaintiff's assertion that the county's motive was to retaliate against him for speaking out against such practices. Accordingly, summary judgment on plaintiff's free speech claim is warranted.

## IV. Section 1981 Claim

■ Defendants seek summary judgment on plaintiff's claim brought pursuant to § 1981 for race discrimination. Plaintiff alleges that the defendants, acting under color of state law, intentionally discriminated against him on the basis of his Native American race in violation of his rights secured by the Equal Protection Clause of the Fourteenth Amendment. Although this court has found that plaintiff was an employee at will, this finding does not preclude a § 1981 claim, as the Tenth Circuit has concluded that "the employment-at-will relationship encompasses sufficient contractual rights to support section 1981 claims for wrongful termination." *Perry v.*

---

**6.** Neither the plaintiff nor the county has articulated any interest for the court to balance, pursuant to *Pickering,* and the court finds it unnecessary to address this issue in light of its finding that plaintiff's speech was not protected. The court will merely note that "the relative importance of the plaintiff's comments under the First Amendment weakens when the comments become a pretext for carrying out a caustic personal attack" on another. *Scroggins v. City of Topeka, Kansas,* 2 F.Supp.2d 1362, 1369 (D.Kan.1998).

*Woodward,* 199 F.3d 1126, 1133 (10th Cir. 1999).

### § 1983 as Exclusive Remedy

■■■ Defendants contend that plaintiff cannot bring a § 1981 claim against the county because § 1983 affords the exclusive remedy for such claims. This court has previously rejected similar claims. *See Morris v. Kansas State Dept. of Revenue,* 849 F.Supp. 1421 (1994); *Gallardo v. Board of County Com'rs, Kearny County Kansas,* 857 F.Supp. 783, 786 (D.Kan. 1994). In those cases, this court recognized that the Supreme Court in *Jett v. Dallas Independent School Dist.,* 491 U.S. 701, 733, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) held that " § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units, but found that when the Civil Rights Act of 1991 amended § 1981 to clarify that [t]he rights protected by this section are protected against ... impairment under color of State law," [7] such amendment had the effect of overruling *Jett. See Morris,* 849 F.Supp. at 1426.

Although the Tenth Circuit has not addressed this issue, those circuit courts which have done so uniformly hold that the 1991 amendment had no affect on the court's opinion in *Jett,* thus the exclusive remedy for violation by state governmental units of rights guaranteed by § 1981 is provided by § 1983. *See Oden v. Oktibbeha County,* 246 F.3d 458 (5th Cir.2001); *Butts v. County of Volusia,* 222 F.3d 891, 894 (11th Cir.2000); *Dennis v. County of Fairfax,* 55 F.3d 151, 156 n. 1 (4th Cir. 1995); *Cerrato v. San Francisco Community College Dist.,* 26 F.3d 968 (9th Cir. 1994); *Williams v. Little Rock Mun. Wa-*

*ter Works,* 21 F.3d 218 (8th Cir.1994). The rationale of these cases is that the legislative history indicates that subsection (c) was added to reaffirm the finding that Section 1981 applied to nongovernmental entities,[8] rather than to overrule *Jett. See also Sims v. Unified Government of Wyandotte County/Kansas City,* 120 F.Supp.2d 938, 953 (D.Kan.2000) (so finding).

The court, with the benefit of these recent cases, is persuaded by the rationale set forth therein that § 1983 provides the exclusive remedy for pursuing damages against a state actor for claims arising under § 1981. Accordingly, summary judgment is appropriate on plaintiff's § 1981 claim.

### V. Motion to Dismiss Official Capacity Claims

The individual defendants move the court to dismiss plaintiff's claims against them in their official capacities because such claims are redundant of the claims against defendant Board of County Commissioners. Plaintiff responds that it has not yet [9] decided whether it has sued the individual defendants in their official or individual capacities, and that their burden of proving a custom, policy or practice of the county is somehow increased if the court grants the motion. Given the court's findings above, this motion is moot.

■■■ Were it not moot, however, the motion would be granted because it is redundant, confusing, and unnecessary for plaintiff to sue the Board of County Commissioners as well as certain members of the board and plaintiff's supervisor in their individual capacities. Although there is no

---

7. § 42 U.S.C.1981(c).

8. This was the holding in *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976).

9. Plaintiff's response was filed while discovery was ongoing.

Tenth Circuit decision on point, dismissal of plaintiff's redundant § 1983 claim is warranted as a matter of judicial economy and efficiency. The Supreme Court has held that a suit against an individual in his official capacity is really "only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (quoting *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). "As long as the government entity receives notice and an opportunity to respond, an official capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* at 166, 105 S.Ct. 3099. *See Sims v. Unified Government of Wyandotte County/Kansas City, Kansas,* 120 F.Supp.2d 938, 944 (D.Kan.2000). This court has previously applied this rationale to dismiss official capacity claims against individuals where the Board of County Commissioners was a party. *See Gallardo v. Board of County Com'rs,* 67 Fair Empl. Prac. Cas., 1995 WL 106366, *2 (D.Kan. 1995), and would do the same here.[10]

IT IS THEREFORE ORDERED that defendants' motion for summary judgment (Dk. 64) is granted.

IT IS FURTHER ORDERED that defendants' motion to dismiss official capacity claims (Dk. 27) is denied as moot.

---

**10.** Given the findings above, the court finds it unnecessary to address defendants' argument that defendants Bruns, Grau and Schirmer in their individual capacities are entitled to qualified immunity.